James Lewis JACKSON, Appellant,

v.

The STATE of Texas.

No. 73,033.

Court of Criminal Appeals of Texas, En Banc.

Dec. 13, 2000.

Janet Morrow, Robert A. Morrow, Houston, for appellant.

Dan McCrory, Asst. Dist., Atty., Houston, Matthew Paul., State's Atty., Austin, for State.

## OPINION

McCORMICK, P. J., delivered the opinion of the Court in which MANSFIELD, KELLER, PRICE, HOLLAND, WOMACK and KEASLER, JJ., joined;

The offense is capital murder and the sentence is death. Appellant raises fourteen points of error. We affirm.

In point of error thirteen, appellant claims the evidence is insufficient to support the jury's affirmative finding on the "future dangerousness" special issue. Specifically, appellant argues the State failed to prove beyond a reasonable doubt that there is a probability that appellant would constitute a continuing threat to prison and free society. See *Collier v. State,* 959 S.W.2d 621, 623 (Tex.Cr.App. 1997), *cert. denied,* 525 U.S. 929, 119 S.Ct. 335, 142 L.Ed.2d 276 (1998). We are required to view the evidence in the light most favorable to the verdict and then determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Chambers v. State,* 866 S.W.2d 9, 16 (Tex.Cr.App.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).

The evidence at guilt/innocence shows appellant planned to murder his wife because she intended to divorce him. Appellant murdered his wife and her two daughters. Appellant manually strangled them. He later pawned his wife's sewing machine and got high on drugs. The punishment evidence, among other things, shows appellant had been convicted of the felony offense of injuring an elderly person. Appellant shot this person in the face. Viewing the evidence in the light most favorable to the jury's affirmative finding on the "future dangerousness" special issue, we cannot say this finding is irrational. Point of error thirteen is overruled.

In point of error one, appellant claims his confession and its fruits are inadmissible because his warrantless arrest did not meet an exception to the warrant requirement under state law. In point of error two, appellant claims the trial court erroneously denied his requested jury charge

which would have instructed the jury to disregard his confession if the jury found it was the product of an illegal arrest.

Appellant first raised this issue in a pretrial motion to suppress. During the pretrial suppression hearing, various law enforcement personnel testified about the circumstances leading up to appellant's confession. Appellant did not testify at this hearing.

The evidence from the pretrial suppression hearing shows the victims were murdered and their bodies were discovered in an apartment they shared with appellant. Soon after the victims' bodies were discovered on the morning after the murders, appellant arrived at the crime scene while the police were processing it and conducting their investigation. The police quickly learned that appellant lived at the apartment and was married to one of the victims.

Several of the victims' family members were also at the crime scene. One of these family members asked appellant what he had done to the victims. Appellant expressed no curiosity about what this family member meant by this question and he did not ask anything about the victims or why the police were in his apartment. Appellant also did not appear upset or surprised about what was going on.

Another one of the victims' family members cursed appellant and accused him of killing the victims. The police had to separate appellant from the victims' family members who continued to shout threats at appellant. Partly because of the confrontation between the victims' family members and appellant, the police put appellant unhandcuffed in the back of a police car.

The police soon discovered a handwritten note in the victims' apartment. This note stated, "I love [the victims' first names]. I could not take care of my family. I don't have a job. I gave them back to God. He and they will understand. James."

One of the investigating officers then spoke to appellant in the back of the police car. When the detective asked appellant where he was the previous evening, appellant stated that he left the apartment at about 4:15 p.m. and did not return until his recent arrival at the scene. Appellant also stated he had a drug problem and could not keep a job.

Appellant agreed to accompany the police to the homicide office to give a statement. Appellant was transported to the homicide office in the back of a police car in handcuffs. The police told appellant that he was not under arrest and that this was standard procedure. An officer testified that another reason appellant was transported to the homicide office in handcuffs was for the officer's safety because appellant was 6'6" and weighed over 300 pounds. Appellant eventually confessed to the murders. According to the police, appellant was not under arrest when he confessed. The trial court denied appellant's suppression motion.

The prosecution presented this evidence at trial. Appellant testified for the first time at trial that the police never let him leave the police car after he was initially put there. Appellant also testified that when the police handcuffed him for the ride to the homicide office they told him he was under arrest. The trial court denied appellant's requested jury charge on the legality of his arrest.

Appellant claims his "arrest" was illegal because it did not meet an exception to the warrant requirement under state law. His brief states:

"In this case all of Appellant's statements, including the third one (the only inculpatory one) were obtained as a direct result of his illegal arrest. *From the beginning, the police had probable cause to arrest Appellant based upon the signed, handwritten note they found in plain view at the scene.* Instead of taking their evidence to a judge to obtain an arrest warrant, as they are re-

quired to do by Texas law (with certain exceptions not remotely applicable here) the officers arrested appellant without a warrant and questioned him for fifteen hours until they got the confession they wanted.

Any reasonable person subjected to the police conduct in this case would have believed that he was not free to leave. The law enforcement authorities had surrounded and blocked entry to Appellant's apartment. They intercepted him as he returned home; instead of allowing him to enter his apartment they locked him in the back seat of a patrol car. *Then [the police], having seen the handwritten note reading, "I love [naming the victims' first names]. I could not take care of my Family. I don't have a Job. I gave them back to God he and they will understand James," and knowing Appellant's name and relationship to the three deceased women, came down to the patrol car and questioned Appellant."* (Emphasis Supplied).

■ Appellant's brief does not clearly set out when appellant claims the police illegally "arrested" him. It appears he claims an illegal "arrest" occurred when "the police had probable cause to arrest Appellant based upon the signed, handwritten note they found in plain view at the scene" and when the police learned "Appellant's name and relationship to the three deceased women."[1]

■ We agree with appellant that "from the beginning" the police had probable cause to arrest appellant "based upon the signed, handwritten note" together with the police knowledge of appellant's name and his relationship to the victims and the other circumstances present at the crime scene. See generally *Guzman v. State,* 955 S.W.2d 85, 87 (Tex.Cr.App.1997)

("probable cause" determinations based on common sense and not legal technicalities). We disagree, however, that a warrantless arrest based on this information does not constitute an exception to the warrant requirement. Article 14.03(a)(4), V.A.C.C.P., authorizes a warrantless arrest in these circumstances. See *id.* (police can arrest without a warrant "persons who the peace officer has probable cause to believe have committed an assault resulting in bodily injury to a member of the person's family or household").

■ In addition, since the material facts leading up to when appellant claims he was "arrested" are undisputed, appellant was not entitled to a jury instruction on the legality of his "arrest." Cf. *Thomas v. State,* 723 S.W.2d 696, 707 (Tex.Cr.App. 1986); *Moon v. State,* 607 S.W.2d 569, 572 (Tex.Cr.App.1980). To the extent appellant's trial testimony raised a fact issue on whether he was illegally "arrested" when he was first placed in the back of the police car, the undisputed facts removing the taint of this illegal "arrest" also disentitled appellant to a jury instruction on the legality of this "arrest." See *id.;* Footnote 1.

■ Finally, any error in not instructing the jury on this issue was harmless in light of appellant's handwritten note claiming responsibility for murdering the victims and the other evidence presented at trial. Points of error one and two are overruled.

■ In points of error three, four, and five, appellant argues that the mitigation special issue violates the Eighth Amendment. In points of error six and seven, appellant claims the "10–12" rule violates the Eighth Amendment. We have resolved these claims adversely to appellant. See *Prystash v. State,* 3 S.W.3d 522, 536–37 (Tex.Cr.App.1999). Points of error three through seven are overruled.

1. If appellant claims an illegal arrest occurred when he was first placed unhandcuffed in the back of the police car, the trial court was entitled to find otherwise at the pretrial suppression hearing. Moreover, for the reasons that follow in the text, subsequent and intervening events such as the officers' discovery of the note removed the taint of this "illegal" arrest. See *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Johnson v. State,* 871 S.W.2d 744 (Tex.Cr.App.1994).

■ In points of error eight and ten, appellant claims counsel was ineffective for not claiming that the Eighth Amendment erects a *per se* bar to the admission of victim impact evidence.[2] The Eighth Amendment erects no *per se* bar to the admission of this evidence. See *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Mosley v. State*, 983 S.W.2d 249, 261–65 (Tex.Cr.App. 1998), cert. denied, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). Points of error eight and ten are overruled.

■ In his ninth point of error, appellant asserts for the first time on appeal that he is entitled to a new punishment hearing during which he now informs this Court he will decide whether to waive the mitigation issue. See *Mosley*, 983 S.W.2d at 263–64 (*dicta* suggesting that a defendant may waive the mitigation issue). Appellant did not raise in the trial court a claim that he could waive the mitigation issue, so this claim has not been preserved for appeal. Point of error nine is overruled.

In his eleventh point of error, appellant argues that counsel was ineffective for failing to object to the prosecution's jury argument at punishment that jurors should consider victim impact evidence in answering the "future dangerousness" special issue. During closing argument at the punishment phase, the prosecution without objection urged the jury to consider victim impact evidence in answering the "future dangerousness" issue.

"We want you to consider the effect this crime has had on the victims, not only Ericka and Sonny and Sharon, but Johnny Melvin Mayes, their father. You could imagine how he feels now.

How he must have felt that day when he found out that his only two daughters, teenage daughters were gone. He would never see them again, he would never talk to them again, wouldn't see Ericka graduate, wouldn't see them get married, wouldn't see them grow up and have children, would never experience any of those joys that we all take for granted because [appellant] took all of that away from him.

"We all hope that when we have kids, I know a lot of you have had kids already, that you're going to go before they do. How tragic it is for a parent to have to lose a child while they are still alive. Johnny Melvin Mayes had to go through that thanks to [appellant], and he lives with the loss of his two daughters everyday. You know that from what his own mother told you earlier today. We certainly want you to consider how this crime has affected Mr. Mayes."

■ In *Mosley*, this Court decided that victim impact evidence "is relevant only insofar as it relates to the mitigation issue." See *Mosley*, 983 S.W.2d at 263. *Mosley* also decided that victim impact evidence "of which a defendant is aware at the time he commits the crime is necessarily relevant to his future dangerousness and moral culpability." See *Mosley*, 983 S.W.2d at 261 fn. 16.

■ It is difficult to imagine how appellant could not have reasonably foreseen the impact that the victims' deaths would have on others. The victim impact evidence, therefore, was relevant to the "future dangerousness" issue. Moreover, any error in the prosecution's argument did not harm or prejudice appellant. The

2. During the punishment phase, the grandmother of two of the victims testified about the reaction of her son to his daughters' murders. The grandmother testified that she and her family had to physically keep her son from going to the apartment where the girls were murdered, and that she finally asked a neighbor to call 911 and request police assistance in talking her son out of going to the apartment. The grandmother also testified that her son rolled on the ground of her home and screamed, "[J]ust bury me in a hole, I can't take it, I don't have no children, I don't have anybody anymore." Since the death of the girls, her son had become forgetful, and moaned frequently in the morning and at night. He stood in the dining room turning around and around the night before trial.

prosecution could have made the same argument with respect to the mitigation issue. And, it is difficult to conceive of the jury ignoring all the other evidence and affirmatively answering the "future dangerousness" special issue based solely on the victim impact evidence. On this record, the jury would have affirmatively answered the "future dangerousness" special issue with or without the prosecution's jury argument. Point of error eleven is overruled.

■ In point of error twelve, appellant argues the trial court erroneously overruled his objection to the prosecutor's jury argument at punishment that compared the value of appellant's life to the lives of the victims. The prosecution argued:

"No reason to give this person a life in the penitentiary sentence because he has worked hard in this incident to earn the verdict you're going to give, the verdict the law demands, the verdict the facts demand and the verdict you will always be comfortable with whenever you rise, whenever you set, whenever you go about your business you will be comfortable that you made the right decision to give this man a life sentence to say there are mitigating factors there or to say he is not a continuing threat is to mean that his life is more important than Sharon Jackson's, than Ericka or Sonny's. [Sic]."

The trial court overruled appellant's objection that this argument was "asking the jury to make a comparative judgment based on value of life on victim versus the defendant."

■ Relying on *Payne*, appellant argues that a prosecutor may not compare the worth of a victim to a defendant's worth. This is incorrect because *Payne* discourages "measuring the worth of the victim compared to other members of society." See *Payne*, 111 S.Ct. at 2607 (victim impact evidence should not encourage "a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose

victims are perceived to be less worthy"); *Mosley*, 983 S.W.2d at 262; compare *Goff v. State*, 931 S.W.2d 537, 554–56 (Tex.Cr. App.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997) (defendant not permitted to present evidence of victim's homosexuality on "assumption that jury would consider a homosexual a less valuable member of society" than other members of society).

The prosecution's argument did not do this. It did not use the victim impact evidence for a purpose prohibited by *Payne* and *Mosley*. Point of error twelve is overruled.

■ In point of error fourteen, appellant argues the trial court erred in denying his pretrial motion to introduce testimony of his family and friends regarding their feelings on the prospect of a death sentence and the impact his execution would have on them. The trial court did not abuse its discretion to exclude this testimony. See *Fuller v. State*, 827 S.W.2d 919, 935–36 (Tex.Cr.App.1992), cert. denied, 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993). Point of error fourteen is overruled.

The judgment of the trial court is affirmed.

MEYERS, J., filed a concurring opinion; MANSFIELD, J., filed a concurring opinion on Point of Error No. 11; KELLER, J., concurred on Point of Error No. 11; JOHNSON, J., filed a concurring opinion in which PRICE, HOLLAND, and WOMACK, JJ., joined.

MEYERS, J., delivered this concurring opinion.

The majority quietly creates new law today, elevating to a holding dicta previously contained in a footnote.

In *Mosley v. State*, 983 S.W.2d 249, 263 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999), the Court broke ground in holding that victim impact and character evidence

is relevant to the mitigation special issue at punishment in capital cases. But the Court took pains to note that it was relevant only to the mitigation issue:

> ... victim impact and character evidence is relevant only insofar as it relates to the mitigation issue. Such evidence is patently irrelevant, for example, to a determination of future dangerousness.

*Id.* The Court even went so far as to state that a capital defendant could avoid the State's presentation of victim-related evidence by affirmatively waiving reliance upon the mitigation issue:

> Victim-related evidence is relevant to show that the mitigating circumstances are not "sufficient" to warrant imposing a life sentence. Such evidence would be wholly irrelevant if appellant affirmatively waived submission and reliance upon the mitigation special issue.... [A] defendant can waive reliance upon and submission of the mitigation issue, and if he does, victim impact and character evidence would be irrelevant and hence inadmissible.

*Id.* at 261.

Today's holding that victim-related evidence is relevant to future dangerousness rests on a footnote from the Court's opinion in *Mosley* which appears to recognize an exception to the rule that such evidence is irrelevant to future dangerousness.

There, the Court noted that victim-related evidence "of which a defendant is aware at the time he commits the crime is necessarily relevant to his future dangerousness...." *Id.* at 261 n. 16. No authority is cited or discussion is undertaken in support of the Court's statement. Considering that the *Mosley* footnote was dicta,[1] does not provide any explanation beyond its two sentences, and appears to recognize a significant exception to what is stated in plain terms in the body of the Court's opinion in *Mosley*, and considering that the Court prior to *Mosley* was divided on this issue,[2] it would seem that the majority today would provide some explanation and further authority for its holding. *See Ex parte Alexander*, 861 S.W.2d 921, 922 (Tex. Crim.App.1993) (this Court not bound by dicta found in footnotes); *Young v. State*, 826 S.W.2d 141, 144 n. 5 (Tex.Crim.App. 1991) (opinion on original submission)(noting in footnote that footnotes are generally regarded as dictum).

I nonetheless concur in the result. Appellant claims his counsel was ineffective for failing to object to the State's argument at punishment that the jury should consider victim impact evidence in answering the future dangerousness special issue. Even assuming counsel's failure to object amounted to deficient performance, appellant nonetheless does not prevail on this issue because he has failed to demonstrate

1. The Court in *Mosley* assumed for purposes of its analysis that the defendant "was unaware, at the time of the crime, of the victims' character or of the impact that the victims' deaths will have on others." *Mosley*, 983 S.W.2d at 261 n. 16.

2. In *Ford v. State*, 919 S.W.2d 107, 115 (Tex. Crim.App.1996), a majority of the Court held that victim-impact evidence was relevant at punishment in a capital case. The Court did not specify as to which issue(s) it was relevant to, but only that it was "relevant to sentence." In a case decided on the same day, *Smith v. State*, 919 S.W.2d 96 (Tex.Crim.App.1996), *cert. denied*, 519 U.S. 1030, 117 S.Ct. 587, 136 L.Ed.2d 516, a three-judge plurality held that victim-character and victim-impact evidence was irrelevant to either the future dangerous-

ness issue or the mitigation issue. The plurality nonetheless held the error in admitting such evidence was harmless. One judge dissented on the ground that he did not view the error as harmless, but otherwise joined. *Id.* (Clinton, J., dissenting). Three other judges concurred in the result without opinion. *Id.* (McCormick, P.J., White and Keller, J.J., concurring). Another judge concurred with opinion, suggesting that victim-impact evidence may be relevant, subject to the rigors of Rules 401, 402 and 403. *Id.* (Overstreet, J., concurring). Finally, another judge concurred with opinion, stating that while victim-impact evidence had no relevance to future dangerousness, it was relevant to the mitigation issue. *Id.* at 105–06 (Mansfield, J., concurring).

prejudice. The State's argument as to the victim-impact evidence was part of a longer discourse concerning appellant's lack of remorse for the murders. Lack of remorse and disregard for human life is relevant on the issue of future dangerousness. In addition, the argument fell immediately before the State's discussion of the mitigation issue, the issue under which the State could have properly asserted the victim impact evidence.

Further, the facts of the crime were alone sufficient to support an affirmative finding of future dangerousness. Appellant choked both of his step-daughters and his wife because he was angry about his wife's stated intentions to divorce him. When his wife had refused to talk to him on the phone that day, appellant stated "That's when I made up my mind to just take her out...." When one of his step-daughters came home from school that day, appellant asked her how she felt about the divorce. When she expressed indifference, appellant choked her with his forearm and placed her in her bed. When the second daughter returned home, he asked her about the divorce. She told him she would love him regardless of the divorce, and when she approached appellant to hug him, he choked her. He also put her body in her bed. When appellant's wife later came home, she checked on the girls and thought they were asleep. She told appellant she still intended to divorce him, and appellant choked her to death as well. Other evidence of violence on the part of appellant was admitted on the issue of future dangerousness.

For these reasons, I concur.

MANSFIELD, J., delivered the concurring opinion.

I do not agree that victim impact evidence is relevant with respect to the future dangerousness special issue. However I do not believe that the argument by the prosecution at punishment that the jury should consider victim impact evidence in the context of the future dangerousness special issue harmed appellant, given the circumstances of the offense and given the other evidence introduced at appellant's trial.

Accordingly, I can only concur with respect to the majority's disposition of point of error eleven and otherwise join the opinion of the Court.

JOHNSON, J., filed a concurring opinion, in which PRICE, HOLLAND and WOMACK, JJ., joined.

I concur only in the judgment affirming the conviction and sentence. I write separately to explain my reasons for doing so.

In point of error thirteen, appellant alleges that the State failed to prove beyond a reasonable doubt the probability that appellant would constitute a continuing threat to prison society for forty years and/or that he would constitute a continuing threat to free society if he were released in forty years. The trial court did instruct the jury on parole eligibility. In reviewing the sufficiency of the evidence supporting the future dangerousness issue, we ask whether, in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Chambers v. State*, 866 S.W.2d 9, 16 (Tex.Crim.App.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994).[1] "As to future dangerousness,

---

1. The jury may also employ a non-exclusive list of factors to assist in assessing the future dangerousness issue, including:

   1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
   2. the calculated nature of the defendant's acts;
   3. the forethought and deliberateness exhibited by the crime's execution;

we have held that in deciding whether a defendant poses a continuing threat to society, a jury considers not only free society, but also prison society." *Morris v. State*, 940 S.W.2d 610, 613 (Tex.Crim.App. 1997), *cert. denied*, 520 U.S. 1278, 117 S.Ct. 2461, 138 L.Ed.2d 218 (1997). A jury can rationally infer future dangerousness from the brutality of the offense alone. *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex.Crim. App.1995). Viewed in this light, the evidence adduced at trial supported an affirmative finding on future dangerousness.

In a statement proffered at trial, appellant confessed that he and his wife, Sharon, argued on Monday and Tuesday, April 6 and 7, 1997, about his unemployment. On Wednesday, she told appellant that she intended to file for divorce. She refused to talk to him on the phone at work that day. According to appellant's statement, "That's when I made up my mind to just take her out, because I felt like the reason she was leaving me was unnecessary and there was no just cause for it."

Later on Wednesday, appellant's stepdaughter, Sonny, returned home at 2:30 p.m., and appellant called her into the master bedroom to discuss the divorce with her. When Sonny expressed indifference about the divorce, appellant choked her with his forearm. He then hid her body in her bed. When Sonny's sister, Ericka, returned home at 2:55 p.m., appellant also called her into the master bedroom to discuss the divorce with her. Ericka told appellant that she would love him regardless of the divorce. When Ericka approached appellant to hug him, appellant choked her to death, then placed her in her bed. According to appellant, "[t]hat was cleaning up behind a wrong that I had already did."

Shortly thereafter, Sharon phoned appellant and asked him to pick her up from work. When she asked the whereabouts of the girls, appellant told her that Sonny had stayed late at school and that Ericka had gone to visit her army recruiter. Sharon checked on the girls when she arrived home and thought they were asleep. She asked appellant not to wake them because they had stayed up late the night before. After telling appellant that she still intended to divorce him, appellant choked her to death, as well. He then pawned her sewing machine and got high on drugs.

During the punishment phase of appellant's trial, the State introduced the testimony of Wanda Wallace, the grandmother of three of appellant's children. Wallace testified that appellant dated Wallace's daughter, Shernel Benson, and fathered three children by Benson.[2] During February of 1989, appellant introduced Benson to drugs, taking Benson and their three-year-old daughter, Stephanie, over to a "drug house." Wallace went to the "drug house" herself to retrieve Stephanie and returned to her home with the child. When Wallace arrived home, Wallace's husband and father were charging a car battery with jumper cables. Wallace returned the jumper cables to the trunk of the car and walked back between the car and the van. Her sister called, "[L]ook out, he got a gun," and appellant fired a pellet at Wallace and hit her car trunk. Appellant's second shot struck Wallace's father in the face and ear. The third shot went over Wallace's head and hit the windows of the apartment behind her. Appellant was charged with the felony offense of injury to the elderly and received ten years in the Texas Department of Criminal Justice—Institutional Division. Finally,

---

4. the existence of a prior criminal record and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or domination of another at the time of the offense;

7. psychiatric evidence; and
8. character evidence.
*Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim. App.1987).

**2.** These children were not the victims in the instant case.

Wallace testified that when Benson became pregnant with their first child, appellant was married to another woman. Appellant's wife later died.

Although appellant was perturbed about his impending divorce, his state of mind does not temper the commission of a triple murder. Disguising the girls' deaths and lying to their mother about their whereabouts were deliberate acts calculated to conceal his actions. Further, his determination to kill Sharon on the morning after she told him that she intended to file for divorce exhibited forethought and deliberateness.

These factors, coupled with appellant's prior criminal record, including his attempt to shoot his children's grandmother, are evidence of an escalating pattern of violence. We have held previously that "an escalating pattern of disrespect for the law" supports a finding of future dangerousness. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Appellant has failed to undermine the sufficiency of the evidence supporting the future dangerousness issue.

In his first point of error, appellant argues that police arrested him without an arrest warrant in violation of Chapter 14 of the Texas Code of Criminal Procedure, thereby rendering appellant's confession and the fruits thereof inadmissible.[3] Following a hearing on a motion to suppress on these grounds, the trial court found appellant's statement admissible. We review a trial court's decision at a suppression hearing to admit or exclude evidence under a standard of abuse of discretion. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim.App.1993). We will not disturb factual determinations made by the trial court at a hearing on a motion to suppress evidence if the record supports its findings. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). While we defer to the trial court's findings based upon the

credibility and demeanor of the officers testifying at the suppression hearing, we also consider the testimony of appellant, who testified for the first time at trial, to determine *de novo* the legality of appellant's arrest. *See Guzman*, 955 S.W.2d at 89 ("appellate courts may review de novo 'mixed questions of law and fact' ").

At the suppression hearing and at trial, several officers who were present at the crime scene and at the stationhouse on the day after the murders recounted the events leading up to appellant's confession. Appellant encountered law enforcement officials shortly after he arrived at the crime scene at 9:40 a.m. on April 9, 1997. Upon his arrival, the victims' family members cursed appellant and accused him of committing the victims' murders. Accordingly, Officer Gutierrez intervened and asked the family members to leave the area while he frisked appellant, then placed him in the back seat of a patrol car without handcuffs. While Gutierrez removed appellant from the vicinity of the victims' enraged family members, Detective Rossi and several other deputies were investigating the crime scene in the apartment upstairs. During his first cursory inspection of the apartment, Rossi discovered a note which read: "I love Sharon, Sonny, Ericka. I could not take care of my family. I don't have a job. I gave them back to God. He and they will understand. James." Rossi heard that the husband of one of the victims had arrived downstairs, and shortly thereafter Rossi went downstairs and visited with appellant in the back seat of the patrol car. Appellant asked Rossi if he was under arrest, to which Rossi replied that he was not under arrest. Rossi asked appellant for his written consent to search the apartment and appellant's car, and appellant gave it. Appellant also agreed to give Rossi a statement at the sheriff's office located at 601 Lockwood. Between twenty and forty minutes later, another

3. Chapter 14 of the Texas Code of Criminal Procedure [Arrest Without a Warrant] delineates the cases in which a "peace officer or any other person, may, without a warrant, arrest an offender" and the required procedures.

officer removed appellant from the first patrol car and handcuffed him. Rossi explained to appellant that the officer was handcuffing him according to police procedure and for security purposes.[4] Appellant indicated that he understood.

After leaving the scene and arriving at the Lockwood office, the officer removed appellant's handcuffs. Detective Burch then read appellant his rights. Between 11:00 a.m. and 1:30 p.m., appellant gave a handwritten statement and a typewritten statement, both of which exonerated him, and both accompanied by *Miranda* warnings.[5] As appellant signed the written warnings, he asked Burch if he was in custody. Burch replied that appellant was a suspect, but did not say that appellant was in custody. At some point following the statements, Burch showed appellant to the bathroom. After reading appellant's two statements, Rossi asked appellant to give head hair, pubic hair, fingernail scrapings, blood and saliva samples, and his clothes for analysis. Appellant agreed.

Between 2 p.m. and 4 p.m., Ernie Hulsey administered a polygraph examination to appellant at the Lockwood office with appellant's consent, then confronted appellant with his conclusion that the test results showed that appellant was untruthful on relevant questions.

From about 7 p.m. to 11 p.m., appellant conversed with Detective Pinkins about issues unrelated to the facts of the case. At about 11 p.m., Pinkins asked appellant about some aspects of the case, in particular, the note found at the scene of the crime. Appellant admitted that he wrote it. Around midnight, Detective Brown relieved Pinkins for forty-five minutes to an hour while Pinkins took a break, then called Pinkins back into the interview room when appellant announced that he

wished to confess. Appellant made his confession at 1:10 a.m., again with the accompaniment of written *Miranda* warnings. At no time during the day did appellant ask for a lawyer, ask to terminate any interview, or ask to leave the stationhouse.

After hearing the testimony of members of the Harris County Sheriff's Department, at both the suppression hearing and trial, appellant testified, for the first time, at trial. According to appellant's version, police refused to allow appellant to leave the patrol car at the crime scene. Further, a detective got into the car with appellant and asked him to sign a consent form purportedly allowing the police to remove his wife's and step-daughters' bodies from the apartment. Appellant did not read the contents of the consent form before he signed it. Appellant repeatedly asked permission to go upstairs to his apartment, which police denied. When police removed appellant from the first patrol car to handcuff him, they told appellant that he was under arrest. After appellant arrived at the police station, a detective, possibly Detective Burch, handcuffed appellant to a bench. The same detective asked appellant to write down his whereabouts during the crime. Appellant then asked the detective where his lawyer was, and the detective told appellant that he did not need a lawyer. The detective had not yet read appellant his rights. Appellant finally gave a statement without the presence of a lawyer because the detective told appellant repeatedly that he was not under arrest. At no point did the detective read appellant his rights, although appellant did sign a waiver of his rights before handwriting his first statement.

According to appellant, about forty-five minutes after taking his handwritten statement, Detective Burch moved appellant to

---

4. Rossi later explained on cross-examination that the officer had handcuffed appellant because he was the only person transporting appellant to the office, because of appellant's size at 6' 6" and 305 pounds, and because of the scene of rowdy people.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

an interview room for further questioning. Detective Rossi and four other officers entered the interview room, showed appellant the note left at the crime scene, and asked appellant to explain it. Appellant told officers that "it was a prayer that [appellant] used to pray." The officers then told appellant that he was a suspect. Appellant stated that he became upset by the questioning and repeatedly asked the officers if he could leave. The officers refused to allow appellant to leave because they wanted to continue questioning him. They questioned appellant for forty-five minutes to an hour.

After the initial period of questioning, Detective Rossi and other officers returned to the interview room and asked appellant if he was involved in a cult murder in California, comparing the murder in California to the instant case. One of the other detectives then told appellant that "when [the detective] walked in the [bedrooms at the apartment] that the bodies had called out to him that [appellant] had done it, [appellant] had done it, for [the detective] to help them out." Appellant again asked to leave the interview room. The officers refused, telling him to calm down. They continued to question him about the cult murder in California.

Later, a detective asked appellant for some specimens from appellant which appellant did not agree to give. Finally, appellant testified that he did not author the statement confessing to the crime but that Detective Brown deceived him into signing it by telling him it was just a typed version of his previous handwritten statement, even though the new statement was considerably longer than the first statement and began differently. The detective encouraged appellant to sign the statement so he could take appellant home. After appellant signed the statement, the detective took appellant to jail.

Given the evidence, I believe that the police properly arrested appellant without a warrant. Under TEX.CODE CRIM. PROC. art. 14.03(a)(4), a peace officer may arrest, without warrant, "persons who the peace officer has probable cause to believe have committed an assault resulting in bodily injury to a member of the person's family or household." We have held that the test for probable cause for a warrantless arrest is "[w]hether at that moment the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrested person] had committed or was committing an offense." *Rance v. State*, 815 S.W.2d 633, 635 (Tex.Crim.App. 1991) (citing *Stull v. State*, 772 S.W.2d 449, 451 (Tex.Crim.App.1989)). Upon discovery of the note at the crime scene by Detective Rossi and other deputies, probable cause arose to arrest its author. When Rossi also learned that appellant was both its author and the husband of one of the victims, the language of art. 14.03(a)(4) vested him with the statutory right to arrest appellant without a warrant. Therefore, appellant's confession stemmed from a proper warrantless arrest, consummated possibly before appellant left the crime scene and certainly before he confessed.

In his second point of error, appellant argues that the trial court erred in refusing his request for an art. 38.23 instruction, which would instruct the jury to disregard appellant's written statement if they found that police had obtained it as a product of an illegal warrantless arrest. Since, as explained above, I believe that appellant gave his confession following a proper warrantless arrest under art. 14.03(a)(4), the confession was admissible as the product of a legal arrest.

In points of error three, four, and five, appellant argues that the mitigation special issue violates the Eighth Amendment, because (1) it omits a burden of proof, (2) we cannot conduct a meaningful appellate review of the jury's determination, and (3) we will not review the mitigation issue for sufficiency of the evidence. As appellant acknowledges, we have heretofore foreclos-

ed each of these arguments relating to the mitigation special issue. *See, e.g., Anderson v. State*, 932 S.W.2d 502, 508 (Tex.Crim.App.1996), *cert. denied*, 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997); *McFarland v. State*, 928 S.W.2d 482, 498–99 (Tex.Crim.App.1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997); *Eldridge v. State*, 940 S.W.2d 646, 652–53 (Tex.Crim.App.1996).

In points of error six and seven, appellant argues that requiring ten votes for the jury to return a negative answer to the first or second special issue violates the Eighth Amendment. Appellant tangentially complains that "truth-in-sentencing" mandates an instruction on the default penalty of life imprisonment to avoid jurors' speculation on the consequences of a hung jury. However, we have previously upheld as constitutional the instructions in art. 37 .071, sections 2(d) and 2(f), known as the "10–12" rule. *See, e.g., McFarland*, 928 S.W.2d at 519. Further, we have previously held that "truth-in-sentencing" does not mandate that the jury receive information as to the "default penalty." *See, e.g., McFarland*, 928 S.W.2d at 519.

In points of error eight and ten, appellant alleges that the Eighth Amendment erects a *per se* bar to the admission of victim impact evidence for the purpose of mitigation in the present Texas death penalty scheme; and consequently, that trial counsel rendered ineffective assistance in violation of federal and state constitutions by failing to renew his objection during the punishment phase to the admission of victim impact evidence.

During the punishment phase, the State called Ira Lane Mayes, the grandmother of Ericka and Sonny Mayes. Mayes testified to the reaction of her son, Johnny Melvin Mayes, upon hearing the news of his daughters' murders, that she and her family had to physically hold him to keep him from going to the apartment where the girls were murdered, and that she finally asked a neighbor to call 911 and request police assistance in talking her son

out of going to the apartment. She further testified that her son rolled on the ground of her home and screamed, "[J]ust bury me in a hole, I can't take it, I don't have no children, I don't have anybody anymore." Since the death of the girls, her son had become forgetful, moaned frequently in the morning and at night, and stood in the dining room turning around and around the night before trial.

The Supreme Court has held that if individual states choose to permit the admission of victim impact evidence and prosecutorial argument on victim impact evidence, "the Eighth Amendment erects no *per se* bar," regardless of the death penalty scheme employed by the individual state. *Payne v. Tennessee*, 501 U.S. 808, 826–28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). As appellant acknowledges, we have previously held victim character and impact evidence admissible in the context of the mitigation special issue, "to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." *Ladd v. State*, 3 S.W.3d. 547, 571 (Tex.Crim.App.1999) (citation omitted), *cert. denied*, —— U.S. —— 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). As such, appellant's claim of ineffective assistance of counsel also fails.

In his ninth point of error, appellant asserts that we should grant him a new trial on punishment and offer him the option of waiving submission of the mitigation issue per *dicta* in *Mosley v. State*, 983 S.W.2d 249 (Tex.Crim.App.1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

Appellant claims that the law existing at the time of his punishment trial, five months prior to this Court's decision in *Mosley*, prohibited him from waiving the mitigation issue, an option he would have exercised to foreclose the State's introduction of victim impact evidence.

Recently, however, we noted that "[t]his Court's opinion in *Mosley* did not create

... a new rule regarding waiver of the mitigation issue. To date, this Court has not decided whether a capital defendant can waive that issue. The statement in *Mosley* [as to that issue] was not necessary to the holding in that case and is therefore *dicta.*" *Tong v. State,* 25 S.W.3d 707, 711 (Tex.Crim.App. 2000).

In point of error eleven, appellant argues that trial counsel rendered ineffective assistance at punishment for failing to object to the prosecutor's argument that jurors should consider victim impact evidence in answering the future dangerousness special issue. To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) deficient performance, and (2) prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. A defendant must overcome the strong presumption that an attorney's actions were sound trial strategy. *Id.*

During closing argument following the punishment phase, the prosecutor addressed each of the special issues and the corresponding evidence presented at the punishment phase. In concluding his discussion of the future dangerousness issue, he argued without objection:

> We want you to consider the effect this crime has had on the victims, not only Ericka and Sonny and Sharon, but Johnny Melvin Mayes, their father. You could imagine how he feels now. How he must have felt that day when he found out that his only two daughters, teenage daughters were gone. He would never see them again, he would never talk to them again, wouldn't see Ericka graduate, wouldn't see them get married, wouldn't see them grow up and have children, would never experience any of those joys that we all take for granted because [appellant] took all of that away from him.

> We all hope that when we have kids, I know a lot of you have had kids already, that you're going to go before they do. How tragic it is for a parent to have to lose a child while they are still alive. Johnny Melvin Mayes had to go through that thanks to [appellant], and he lives with the loss of his two daughters everyday. You know that from what his own mother told you earlier today. We certainly want you to consider how this crime has affected Mr. Mayes.

These statements fell at the end of a long discourse on appellant's lack of remorse for the murders, as well as his lack of remorse for the effect of the murders on his victims' family members. While we have observed that victim impact evidence is generally relevant only to the mitigation issue, we have also noted that "[v]ictim impact and character evidence of which a defendant is aware at the time he commits the crime is necessarily relevant to his future dangerousness and moral culpability." *Mosley,* 983 S.W.2d at 263 & 261 n. 16; *see also Ford v. State,* 919 S.W.2d 107, 112 (Tex.Crim.App.1996) ("Remorselessness and disregard for human life have been considered in determining the sufficiency of the evidence to support a jury finding of probability of committing criminal acts of violence that would constitute a continuing threat to society") (citations omitted). Because the prosecutor's argument discussed victim impact evidence of which appellant was aware at the time he committed the murders of Sonny and Ericka—namely, that their deaths would grieve their father—it arguably pertained to the issue of future dangerousness. Therefore, appellant has not shown that his attorney rendered deficient performance.

In point of error twelve, appellant argues that the trial court erred by overruling a defense objection to the prosecutor's argument that compared the value of appellant's life to the lives of the victims. Toward the end of closing argument following the punishment phase, the prosecutor admonished the jury:

No reason to give this person a life in the penitentiary sentence because he has worked hard in this incident to earn the verdict you're going to give, the verdict the law demands, the verdict the facts demand and the verdict you will always be comfortable with whenever you rise, whenever you set, whenever you go about your business you will be comfortable that you made the right decision to give this man a life sentence to say there are mitigating factors there or to say he is not a continuing threat is to mean that his life is more important than Sharon Jackson's, than Ericka or Sonny's. [Sic].

Immediately following this statement, defense counsel objected on the grounds that the prosecutor was "asking the jury to make a comparative judgment based on value of life on victim versus the defendant," which the trial court overruled.

Citing *Payne v. Tennessee, supra,* appellant argues that a prosecutor may not compare the life worth of a victim with the defendant's. Appellant misinterprets *Payne's* holding. The concern at issue in *Payne* was whether admission of victim impact evidence would encourage "a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Payne,* 501 U.S. at 823, 111 S.Ct. at 2607. We have echoed a similar concern. *See Mosley,* 983 S.W.2d at 262. However, the prosecutor's argument in the instant case in no way compared the worths of the victims; instead, it encouraged the jury to assess the death penalty against a defendant who had killed his victims. The authority appellant cites does not stand for the proposition he espouses.

In appellant's fourteenth point of error, he argues that the trial court erred in denying his pre-trial motion to introduce testimony of his family and friends regarding their feelings on the prospect of a death sentence and the impact his execution would have on them. Because the

crux of this testimony necessarily focuses on whether the witnesses believe that appellant should live or die, it does not pertain to appellant's background, character, record, or the circumstances of the offense. *See Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 2949, 106 L.Ed.2d 256 (1989); *Goff v. State,* 931 S.W.2d 537, 555 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). It is therefore irrelevant to the deathworthiness of the defendant. *Fuller v. State,* 827 S.W.2d 919, 936 (Tex.Crim. App.1992) ("since that specific desire does not pertain to appellant's background, character, or record, or the circumstances of the offense, the trial court did not err in prohibiting it"), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993). Accordingly, the trial court did not err in prohibiting this testimony.

Based on the foregoing, I concur only in the judgment affirming the conviction and sentence.