IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,953






EDGARDO RAFAEL CUBAS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 981079 IN THE 184TH DISTRICT COURT

HARRIS COUNTY






 Johnson, J., delivered the opinion of the Court in which Keller, P.J.,
Meyers, Price, Keasler, Hervey, Holcomb, and Cochran, JJ., joined. Womack, J.,
concurred in the result.



O P I N I O N



 Appellant was convicted of a capital murder committed in January 2002. Tex. Penal
Code § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code
of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial court sentenced
appellant to death. Art. 37.071, § 2(g). (1) Direct appeal to this Court is automatic. Art.
37.071, § 2(h). Appellant raises six points of error. We affirm.

 Appellant, a Honduran national, was indicted for the capital murder of fifteen-year-old
Esmeralda Alvarado in Houston, Texas. The indictment alleged that appellant shot and killed
Alvarado while in the course of committing and attempting to commit aggravated sexual
assault. Appellant was arrested at 10:35 a.m. on August 21, 2002, and was taken to the
Houston Police Department homicide office for questioning. Appellant gave several
videotaped statements to police on August 21 and 22. He filed a motion to suppress the
statements, and the trial court held a pretrial hearing to determine their admissibility.

 The evidence at the hearing showed that appellant gave his first videotaped statement
detailing his involvement in the Alvarado case to Officers Jesus Sosa and H. A. Chavez from
1:55 p.m. to 4:30 p.m. on August 21st. He told Sosa and Chavez that he and Walter Sorto
saw a girl talking on a pay phone, that Sorto forced her into their car, and that they drove her
to a secluded location and took turns raping her, but that Sorto was the one who shot and
killed her. Appellant agreed to show police where his gun was located and left with Officer
Alfredo Mares and two other officers at 5:30 p.m. They went to appellant's apartment
complex and one other location, then, shortly before 7:00 p.m., the officers took appellant
before a magistrate. After appellant received his statutory warnings from the magistrate, the
officers took him to participate in a live lineup, bought him dinner at a fast-food restaurant,
and drove him back to the Houston Police Department homicide office, where Mares
interviewed him. Appellant gave a short videotaped statement to Mares at 9:33 p.m., in
which he admitted his involvement in an extraneous robbery. Mares stopped the tape at 9:48
p.m. and started it again at 10:56 p.m. Appellant then confessed that he and Sorto had
committed several robberies and shootings outside various "cantinas" in Houston. The
interview concluded at 11:30 p.m. Officer Alan Brown then transported appellant to the City
of Houston jail for the night.

 Brown picked up appellant from jail at 8:00 a.m. on August 22, and took him to
appear before the magistrate for a continuation hearing. Appellant again received his
statutory warnings. Later that morning, Officer Cecil Mosqueda interviewed appellant. 
Appellant gave a videotaped statement to Mosqueda from 10:50 a.m. to 2:00 p.m., in which
he admitted his involvement in various extraneous offenses, including the rape and murder
of two women in May 2002. (2)

 Appellant gave a final videotaped statement, regarding his involvement in the
Alvarado case, to Officer Xavier Avila at 5:29 p.m. Appellant again explained that he and
Sorto saw a girl talking on a pay phone, that Sorto forced her into their car, and that they
drove her to a secluded location and took turns raping her, but this time he admitted that he,
not Sorto, shot the girl in the head and killed her. This videotaped statement ended at 6:27
p.m.

 In his first point of error, appellant complains solely about the admission of his final
videotaped statement. He asserts that this statement was involuntary because he was
deprived of sleep and "subjected to two full days of interrogation by rotating teams of police
officers." He claims that he did not understand his rights and "truly believed his statements
would not be used against him" because he is "a youth of limited intellect." He also
complains that, when Mosqueda interviewed him, Mosqueda promised appellant that he
would not be charged for the crime.

 "[A] defendant in a criminal case is deprived of due process of law if his conviction
is founded, in whole or in part, upon an involuntary confession, without regard for the truth
or falsity of the confession, [citation omitted], and even though there is ample evidence aside
from the confession to support the conviction." Jackson v. Denno, 378 U.S. 368, 376
(1964)(citations omitted). When determining whether a defendant's will was overborne in
a particular case, courts assess the totality of all of the circumstances surrounding both the
characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte,
412 U.S. 218, 226 (1973).

 "At a suppression hearing, the trial court is the sole judge of the credibility of
witnesses and the weight of their testimony." Wyatt v. State, 23 S.W.3d 18, 23 (Tex. Crim.
App. 2000); Jones v. State, 944 S.W.2d 642, 650 (Tex. Crim. App. 1996), cert. denied, 522
U.S. 832 (1997). We will not disturb the trial court's findings if they are supported by the
record. Id. "We only consider whether the trial court properly applied the law to the facts." 
Id.

 Avila testified at the hearing that appellant agreed to give him a statement and that he
informed appellant that it would be recorded. Avila read appellant his warnings in Spanish,
and appellant initialed each of them and said that he understood them. When Avila asked
appellant if he wanted to waive his rights and give a voluntary statement, appellant replied
in the affirmative. Appellant never asked for an attorney or to terminate the interview. Avila
testified that he never threatened appellant or promised or denied him anything. At the end
of the interview, appellant asked for "a chance to talk by telephone." Avila testified that he
provided appellant with a telephone and allowed him to make a phone call.

 Appellant was twenty-three years old at the time of his arrest. He testified that he
completed the seventh grade in Honduras. (3) He came to the United States to live with his
father in 1999. At the time of his arrest, he worked for a company that installed insulation
material, lived in his own apartment, paid his own bills, owned a car, and was able to read
in Spanish and speak a little English. He testified that he did not understand his legal rights,
even when they were read to him in Spanish; they were "just words," and he did not
understand their significance because he did not know anything about the judicial system in
the United States. (4)

 All of appellant's videotaped interviews were conducted in Spanish, and each of the
officers who interviewed him read the Miranda warnings to him in Spanish. (5) Appellant
consistently indicated that he understood his rights and declined to ask any questions about
them. The officers testified that appellant appeared to understand the warnings and gave
them no reason to believe otherwise. Appellant twice appeared before a magistrate, who read
the Miranda warnings to him in English while an interpreter translated them into Spanish. 
Appellant indicated that he understood his rights both times.

 Appellant testified that he was taken to jail between midnight and 1:00 a.m. on August
22, but he did not have access to a bed until 3:30 a.m., and he could not sleep because other
prisoners were talking all night. He also acknowledged that he could have slept if he had
wanted to do so. He testified that, prior to turning on the videotape, Avila told him that he
would go to jail, where he would be turned "into a little woman" and would "come out
wearing fingernail polish and have long hair." Avila, however, testified that he never
threatened appellant in any manner.

 Appellant complains that Mosqueda promised him he would not be charged with any
crime, and that he made his later statement to Avila implicating himself as the triggerman in
the Alvarado case because he believed Mosqueda's promise. The transcript of the interview
reflects that Mosqueda questioned appellant about multiple extraneous robberies and
murders, and he did not mention the Alvarado case except for two possible references: (6)

[MOSQUEDA]: Well, you all talked about the, the girl from . . . ? You spoke
with an investigator about the girl from . . . from this year?


[APPELLANT]: The one from this year?


[MOSQUEDA]: Yes.


[APPELLANT]: Yes.


[MOSQUEDA]: You already talked about that, right? Um . . . In that one,
you all used a what? What did you all use there?


[APPELLANT]: A forty-five.


 * * *


[MOSQUEDA]: Okay. It's like twelve twenty. Let's see if . . . as I say, uh,
think about it to see if you remember something that you all did. Like I said,
you all already talked about the two girls, you already talked about the girl, you
already talked about that one. You, you say that you don't know anything
about Laura Ayala.[ (7)]


[APPELLANT]: No. Mosqueda first asked appellant about the shooting of a man at a traffic light and the
disappearance of Laura Ayala. Appellant denied his involvement in those cases, but admitted
that he and Sorto had burglarized a house. He also acknowledged that he and Sorto were
involved in the robbery and shooting of two men outside a cantina and the rape and murder
of two women, but said that Sorto was the triggerman. After they discussed these cases,
Mosqueda made the following comment:

I'm going to ask you some questions, let[']s see if you remember. It's ver
[sic], very important, okay? I'm going to tell you something it's that . . .
everything that, that . . . if you don't say or want to say this, eh, we just want
to know. We're not, not, not going to bring charges about this. Understand? 
We just want to know to clarify, okay? Because it seems that Walter already,
already had been doing this a while. Do you understand me? But I want to
know so that we can clarify because it's several.


Mosqueda then asked appellant about numerous unsolved cases, including a string of
robberies and shootings, and bodies that were found in various locations. Appellant denied
any knowledge of these cases.

 Mosqueda testified that when he said, "We're not . . . going to bring charges about
this," he "was referring to a different case," specifically the Laura Ayala case. At the
conclusion of the hearing, the State informed the trial court that it would not offer appellant's
statement to Mosqueda into evidence. The trial court agreed that that particular statement
was inadmissible because Mosqueda's comment was "a textbook example of a promise." 
The trial court then made findings regarding appellant's statement to Avila:

Specifically, I want to note for the record for the Appellate Courts on my
findings of fact that I found the demeanor of Officer Avila to be very
professional on the stand and on the videotape and that he was obviously
speaking with a great deal of authority.


I also want to make a specific finding that when Officer Avila went over the
warnings with the defendant, he did it very carefully, he did it very slowly, he
went to the trouble of finding how far the defendant went in school, asking
him if he preferred the warnings in English or Spanish, and then went over
them carefully, had the defendant look at each warning and initial it.


And I note for the record that Detective Avila took great care in how he gave
the warnings on that fifth statement; and I think he did it as a man with
authority and that he, of course, specifically pointed out that these - - on the
statement that was about to be given by the defendant could be used. I believe
- - I make a finding that the defendant understood the warnings as they were
given on the videotape in State's Exhibit 6 and that the defendant intelligently
waived his rights and that he freely, knowingly, and voluntarily entered the
statement which appears on videotape No. 6.


I do make a specific finding that the time proximity was close between
[appellant's statement to Mosqueda] and [appellant's statement to Avila]. And
I want to make a specific finding also that the wording that was used in the
improper promise [by Mosqueda], although it does use the word "we," it notes
that not filing charges specifically has to do with those things he is talking
about that Walter was already involved with. And, therefore, I find that the
defendant would not have believed that that promise carried over to the
statement taken by Officer Avila.


 The trial court's findings are supported by the record. Wyatt, 23 S.W.3d at 23; Jones,
944 S.W.2d at 650. But even if we were to assume error in the admission of Avila's
statement after Mosqueda's promise, appellant cannot show harm. TEX. R. APP. P. 44.2 (a). 
Appellant asserts that his statement to Avila was the "critical confession" because in it he
admitted that he, not Sorto, was the triggerman in the Alvarado case. However, the jury was
authorized to convict appellant as a principal or as a party to the offense. In his first
statement to Sosa and Chavez, appellant admitted his own participation in the abduction,
rape, and murder of Alvarado, but targeted Sorto as the triggerman. Even without the
admission of his final statement to Avila, the jury could still have convicted appellant as a
party to the offense. Point of error one is overruled.

 In point of error three, appellant claims that the trial court erroneously refused his
request for an Article 38.23 jury instruction on the voluntariness of his statements. "When
the evidence presented at trial raises a factual issue as to whether a defendant had been
warned of his rights and voluntarily waived them prior to making a statement, he is entitled
to an instruction on voluntariness of the confession." Mendoza v. State, 88 S.W.3d 236, 239
(Tex. Crim. App. 2002), citing Dinkins v. State, 894 S.W.2d 330, 353-54 (Tex. Crim. App.),
cert. denied, 516 U.S. 832 (1995). At trial, appellant complained that the following exchange
at the end of his videotaped statement to Sosa and Chavez raised a factual issue as to whether
his statements were voluntary:

CHAVEZ: Okay. Look. This that you have told us about this case is the
truth?


CUBAS: Yes.


CHAVEZ: It's the whole truth? And you're telling us this voluntarily, or
why?


CUBAS: No. Voluntarily, no . . . 


CHAVEZ: And why did you decide to give us the statement on this case?


CUBAS: Because I don't think it serves anything me hiding it. You're going
to blame me for something that I don't deserve.


CHAVEZ: Someone has threatened you?


CUBAS: No.


CHAVEZ: Since you have been here with us?


CUBAS: No.


CHAVEZ: Have we promised you anything for you to tell us what you know
about this case?


CUBAS: No.


CHAVEZ: So then everything that you have told us is voluntary because you
are here?


CUBAS: Yes.


CHAVEZ: (unintelligible) Okay. This interview we're going to finish now,
okay? Right now it's three twenty.


Appellant argued that this exchange suggested "some sort of psychological coercion" during
appellant's first statement and that the issue of voluntariness "applie[d] to all of the
statements" that followed it. (8) The trial court declined to include appellant's requested
instruction in the jury charge.

 The transcript of appellant's videotaped statement reflects that Chavez read appellant
his rights and appellant indicated he understood his rights and acknowledged that he wanted
to explain what he knew about the Alvarado case. Appellant ultimately said at the end of his
statement that no one threatened him or promised him anything, and that everything he told
Sosa and Chavez was voluntary. Sosa and Chavez both testified that appellant said he
understood his rights when they were read to him. Chavez testified that appellant wanted to
give a voluntary statement and was neither threatened nor coerced to do so. The complained-of exchange during appellant's first statement did not entitle him to an instruction on the
voluntariness of all of his statements. The trial court did not err in refusing appellant's
request for an Article 38.23 instruction. Point of error three is overruled.

 In points of error two and four, appellant alleges that his consular rights under the
Vienna Convention on Consular Relations were violated and therefore his statements should
have been suppressed under Article 38.23. (9) Article 36 of the Vienna Convention provides
in pertinent part:

[I]f he so requests, the competent authorities of the receiving State shall,
without delay, inform the consular post of the sending State if, within its
consular district, a national of the State is arrested or committed to prison or
to custody pending trial or is detained in any other manner. Any
communication addressed to the consular post by the person arrested, in
prison, custody or detention shall also be forwarded by the said authorities
without delay. The said authorities shall inform the person concerned without
delay of his rights under this sub-paragraph[.]


Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T 77, 595 U.N.T.S. 261
(ratified by the United States on Nov. 24, 1969). Appellant asserts that the police failed to
inform him "without delay" that he had a right to seek assistance from the Honduran
consulate.

 Appellant was arrested at approximately 10:35 a.m. on August 21. He arrived at the
Houston Police Department homicide office at about 11:20 a.m., and he gave his first
videotaped statement to Sosa and Chavez from 1:55 p.m. to 4:30 p.m. In his first statement,
he admitted his involvement in the Alvarado case, but named Sorto as the triggerman. He
received statutory warnings from a magistrate shortly before 7:00 p.m. He then returned to
the homicide office where Mares interviewed him. He gave a videotaped statement to Mares
between 9:33 p.m. and 9:48 p.m., and another between 10:56 p.m. and 11:30 p.m. Both of
these statements detailed his involvement in extraneous offenses. He spent the night in jail
and received statutory warnings from the magistrate again at 8:00 a.m. on August 22. He
gave another videotaped statement to Mosqueda from 10:50 a.m. to 2:00 p.m., again detailing
his involvement in various extraneous offenses.

 Avila testified that he spoke to appellant at approximately 5:20 p.m. on August 22. 
He testified that before he began recording appellant's statement he asked him if he wanted
to contact the Honduran consulate and appellant "said he didn't need to contact them." 
Appellant, however, testified that Avila never informed him of his right to contact his
consulate. Appellant gave Avila a videotaped statement regarding his involvement in the
Alvarado case between 5:29 p.m. and 6:27 p.m. In this final statement, appellant admitted
that he, not Sorto, was the triggerman.

 Officer Mario Rodriguez testified that he called the Honduran consulate at 5:17 p.m.
on August 22, spoke to a person who identified herself as Alise Valenzuela, and informed
her that appellant had been charged with capital murder. He also sent a fax at 5:58 p.m.
informing the consulate that appellant had been charged with capital murder.

 The record reflects that Rodriguez notified the Honduran consulate of appellant's
capital murder charge approximately thirty-one hours after his arrest. See Sorto, 173 S.W.3d
at 486 (holding that Rodriguez, in faxing the required notification within forty-eight hours
of Sorto's arrest, notified the Salvadoran consulate "without delay"). Appellant cannot
complain that the police failed to tell him that he could request them to notify the consulate
of his detention if they notified the consulate even without his request. Id. at 483. We
conclude that Rodriguez notified the Honduran consulate "without delay" and that the Texas
authorities complied with their obligations under Article 36 of the Vienna Convention. Id.
at 486. Thus, the trial court did not err in refusing to suppress appellant's statements under
Article 38.23. Id.

 Further, appellant has not shown that he was prejudiced or that there was a causal
connection with the acquisition of his statements or the fairness of his trial. Id. at 487. Avila
testified that appellant declined when he asked him if he wanted to contact the consulate, and
there is no indication that the consulate would have assisted him if he had requested that they
be contacted. Appellant's father, Fernando Cubas, testified that he went to the Honduran
consulate on the morning of August 22 to ask for their advice and was told that "the
consulate couldn't do anything concerning the laws of this country." Points of error two and
four are overruled.

 In point of error five, appellant complains that the mitigation special issue is
unconstitutional because it "omits a burden of proof" and "makes impossible any meaningful
appellate review of the jury's determination." He claims that Article 44.251, requiring
appellate review of sufficiency of all capital-punishment issues, when interpreted in
conjunction with Article 37.071, section 2(e), placing no burden of proof in the mitigation
special issue, is infirm under the Eighth Amendment to the United States Constitution. This
Court has previously addressed and rejected these claims, and we decline to revisit these
issues here. Resendiz v. State, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 1032 (2004); Jackson v. State, 33 S.W.3d 828, 840-841 (Tex. Crim. App. 2000),
cert. denied, 532 U.S. 1068 (2001); Prystash v. State, 3 S.W.3d 522, 535-36 (Tex. Crim.
App. 1999), cert. denied, 529 U.S. 1102 (2000). Point of error five is overruled.

 In point of error six, appellant argues that the future-dangerousness special issue is
unconstitutional, citing Apprendi v. New Jersey, 530 U.S. 466 (2000), Ring v. Arizona, 536
U.S. 584 (2002), and Blakely v. Washington, 542 U.S. 296 (2004). He asserts that "[b]ecause
the future dangerousness special issue increases the punishment for capital murder beyond
the prescribed statutory maximum, the issue acts as the functional equivalent of a traditional
element of the crime that has to be proven to a jury beyond a reasonable doubt." He also
contends that the term "probability" in the future-dangerousness special issue "impermissibly
dilutes the reasonable doubt standard."

 We have previously held that Apprendi and Ring are inapplicable to the statutory
scheme in Article 37.071, and Blakely does not affect this holding. Rayford v. State, 125
S.W.3d 521, 534 (Tex. Crim. App. 2003), cert. denied, 543 U.S. 823 (2004); Woods v. State,
152 S.W.3d 105, 121 (Tex. Crim. App. 2004), cert. denied, 125 S. Ct. 2295 (2005). We have
also held that the inclusion of the term "probability" does not render the future-dangerousness special issue unconstitutional. Robison v. State, 888 S.W.2d 473, 481 (Tex.
Crim. App. 1994), cert. denied, 515 U.S. 1162 (1995). Point of error six is overruled.

 We affirm the judgment of the trial court.


Delivered: April 12, 2006

Do Not Publish
1. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.
2. In November 2003, Sorto was convicted of the capital murders of Maria Rangel and Roxana Capulin.
3. A psychiatrist who examined appellant testified at punishment that appellant had an IQ of 78.
4. Appellant introduced into evidence at the pretrial hearing a report of a polygraph examination he took on
April 21, 2004. The polygraph examiner reported "no deception indicated" when appellant said he did not
understand the warnings, did not know he was being videotaped, and did not know his words would be used against
him in court.
5. The trial court found that Sosa, Chavez, and Mares properly warned appellant in compliance with Article
38.22 and Miranda v. Arizona, 384 U.S. 436 (1966), and that appellant voluntarily made his statements to these
officers.
6. Although it is not exactly clear who Mosqueda was referring to when he said, "the girl," we will assume
for the sake of argument that he was referring to Alvarado.
7. The police were also investigating the case of Laura Ayala, a young Houston girl who had been missing
since March 2002.
8. The only statements admitted at the guilt or innocence phase were appellant's first statement to Sosa and
Chavez and his last statement to Avila.
9. The issue of whether Article 36 of the Vienna Convention confers personal rights under the federal
constitution may be definitively resolved only by the United States Supreme Court. Sorto v. State, 173 S.W.3d 469,
480-81 (Tex. Crim. App. 2005). We need not resolve this issue in this case because appellant has not shown that his
rights under the Vienna Convention were violated or that the purported violation either caused him to do anything he
would not otherwise have done or affected the fairness of his trial in any way. Id.