IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,306





ROBERT GENE WILL, II Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM HARRIS COUNTY





 

 Hervey, J., delivered the opinion of the Court in which Keller, PJ, Meyers,
Womack, Keasler, and Holcomb, JJ., joined. Johnson and Cochran, JJ., concurred. Price, J.,
concurred to points of error one, three, eight and seventeen but otherwise joined the opinion
of the court.


O P I N I O N



 A jury convicted appellant of capital murder. The trial court sentenced appellant to death pursuant
to the jury's answers to the special issues submitted at the punishment phase. Appellant raises seventeen
points of error in an automatic direct appeal to this Court. We affirm.

 In point of error five, appellant claims that the evidence is legally insufficient to support the jury's
affirmative finding on the "future dangerousness" special issue. This claim requires the Court to view the
evidence in the light most favorable to the jury's finding and then determine whether any rational trier of fact
could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal
acts of violence that would constitute a continuing threat to society. See Jackson v. Virginia, 99 S.Ct.
2781, 2789 (1979); Allridge v. State, 850 S.W.2d 471, 487 (Tex.Cr.App. 1991), cert. denied, 114
S.Ct. 101 (1993).

 The evidence shows that early on the morning of December 4, 2000, the 22-year-old appellant
shot and killed a uniformed law-enforcement officer who was attempting to arrest appellant for burglarizing
a car. The slain officer's unfired gun was still in its holster when his body was found. The officer sustained
10 gunshot wounds. Some were in the head, one was in the neck, one was in the right chest near the
underarm, and one was on the right wrist. The evidence further indicates that appellant fired the fatal shots
after incapacitating the officer with at least one nonfatal shot.

 During his escape from the scene, appellant came upon a woman sitting in her car. Appellant told
her to get out, pointed a gun at her and told her that he had shot a police officer. The woman got out and
appellant drove away in her car. The police arrested appellant later that morning. Later that afternoon,
the police searched the apartment of appellant's girlfriend and found numerous guns and stolen property.

 Appellant also has convictions for evading arrest (a misdemeanor) and unauthorized use of a vehicle
(a state jail felony) for which he received community supervision. While on this community supervision,
appellant committed an aggravated robbery for which he was placed on deferred adjudication community
supervision. As a condition of community supervision for this aggravated robbery, appellant was sent to
boot camp for three months, where efforts were made to rehabilitate him. Appellant was not a disciplinary
problem during his three months at boot camp, and he "complete[d] fully the boot camp experience." 
Appellant was still on deferred adjudication community supervision for the aggravated robbery when he
murdered the police officer in this case. Appellant committed three "minor" disciplinary rule violations
(banging on a door, possession of tobacco and threatening another inmate) while incarcerated in the county
jail awaiting trial for this capital offense.

 Appellant presented some good character evidence. He also presented evidence of his "minimal"
involvement in the aggravated robbery offense for which he was on probation when he committed this
capital offense. He presented evidence that a life sentence for this capital offense "stacked" onto the
sentence for his aggravated robbery offense would insure that he would spend the rest of his life in prison.

 He also presented the testimony of a criminal-justice professor who testified that murderers and
older prisoners are not likely to commit violence in a structured prison environment. This testimony was
based on the "internal workings [and policies] of the Texas prison system" to keep the number of criminal
acts that occur within the prison system significantly low. It was also based on "risk assessments or factors
that may be considered for determining whether or not someone would commit acts of violence in the
future." This testimony was also based on a "number of different studies that have looked at what are
called actuarial predictions of offending behavior or recidivism and /or offending behavior while in prison." 
On cross-examination, the professor testified that these actuarial studies cannot predict "the specific
behavior of a particular person." (1)

 Appellant also presented the testimony of a psychiatric expert who testified that appellant's criminal
behavior and inability to make right choices is not his fault because he had an unstable family background
which was a "blueprint for developing a criminal." For example,

 Q. We talk often about making the right choices as we become adults and, you know,
some people think, despite whatever happened to you when you're younger, you should
be able to make good choices as you get older and how does-if it does, I mean, how do
these-this type of environment, the environment he grew up in, how does that affect, you
know, his ability to make the right choices as he gets older?


 A. Well, if he's exposed to these events and these influences that shape his personality at
an early age, he does not have the choices that other people have because he doesn't see
the world as other people see it and he doesn't see the world as containing the kinds of
choices that most of us see.


 On cross-examination, the prosecution pointed out that appellant had been evaluated in boot camp
as a "limit tester." Appellant's psychiatric expert agreed that such a person can be categorized as
"manipulative, bright, criminally oriented and greedy." This psychiatric expert also testified on cross-examination that "[l]eft to his own devices, [appellant] cannot sustain himself in a productive way" because
he has no "internal moral compass." This psychiatric expert also testified that appellant "scored very high
in the psychopathic deviate category" which describes a person "who is more likely than any other group
of people to commit criminal acts" and who is "the least likely to change."

 Q. No. I want to know what it tells you about the defendant, the person.


 A. Well, it describes a person who typically does not obey the rules, who has difficulty
profiting from past experience, who has difficulty forming long-term attachments and who
is more likely than any other group of people to commit criminal acts of-violating the law,
in other words.


 Q. So, when you evaluate a person and you determine that they're a psychopathic deviate,
that they score high in that area, what that's telling you is that is a person who we often
call-a person who's unable to conform to society, correct?


 A. Right.


 * * * * * * * * * * * * * * * * *


 Q. And in this case, once again, when we talk about a psychopathetic [sic] deviate, okay,
those, as a category, are the kind of people who are the least likely to change.


 A. Yes, I would say that they're one of the hardest groups to change, yes.

 

 Appellant argues that the issue is whether the evidence supports a finding that he is "likely[ (2)] to
commit criminal acts of violence that would constitute a continuing threat to other people in prison society"
since the evidence shows that a life-sentenced appellant would spend the rest of his life in prison. We have,
however, consistently decided that "society" includes prison society and free society such that the evidence
is sufficient if it supports a finding of "future dangerousness" as to one or both. (3)

 Notwithstanding this, the evidence supports a finding that there is a probability that appellant would
be a future danger to free and prison society. Among other things, the evidence shows that appellant
brutally and senselessly murdered a police officer after efforts were made to rehabilitate appellant following
his commission of an aggravated robbery and that appellant is a "psychopathic deviate," which describes
a person "who is more likely than any other group of people to commit criminal acts" and who is "least
likely to change." Point of error five is overruled.

 In point of error one, appellant claims that the trial court erred in allowing an excessive number of
uniformed law-enforcement officers "in the courtroom, close to the jury" during the trial. After jury
selection, but before the trial began, appellant informed the trial court of his concerns that the presence of
uniformed officers in the courtroom during the trial might be of an "intimidating nature" to the jury. 
Appellant did not seek to have any officers excluded from attending the trial. Instead, appellant asked the
trial court to require any officers attending the trial to wear non-uniform clothes "to ensure their presence
[did not] unduly interfere with the juror's ability to be fair and impartial." The trial court denied the motion.

 Appellant renewed this motion twice during the two and one-half week trial. Before opening
statements, appellant caused the record to reflect that there were 12 uniformed officers "sitting in that part
of the courtroom closest to the jury." On the third day of trial, appellant caused the record to reflect that
there were "what appear[ed]" to be 18 uniformed officers in the courtroom. Each time, the trial court
denied the motion. Appellant also referred to the presence of officers in the courtroom during closing jury
arguments.

 No matter how much all of us would like to bring [the slain officer] back, a verdict of death
won't do that.


 Try as we all might to reunite that good father with his best friend, his wife, his confidante,
we can't do that. Try as we might to put an 8-year-old daughter and a 20-year-old
daughter back with a wonderful father, we won't be able to do that. Unfortunately we
can't heal the pain and loss and incomprehensible void that a mother and father feel for the
loss of a good man. And try as we might, we look out here, we see all these officers and
they're all good officers. Try as we might, they've lost a good friend, a confidante and one
of theirs, we can't bring [the slain officer] back.


 Appellant concedes on appeal that he cannot show actual prejudice or that the police uniforms
actually influenced the jury. Rather, appellant claims, as a matter of federal constitutional law, that these
uniforms were inherently prejudicial by creating an unacceptable risk that impermissible factors came into
play to influence the jury. See Holbrook v. Flynn, 106 S.Ct. 1340, 1346-47 (1986); Howard v. State,
941 S.W.2d 102, 117-18 (Tex.Cr.App. 1996).

 We cannot agree with this claim based on a record showing that appellant objected to the officers'
uniforms on only two occasions during a two and one-half week trial consisting of 12 days of testimony. 
Compare Howard, 941 S.W.2d at 118 (record was "too scant to make a case for inherent prejudice"). 
Moreover, in Holbrook, the Supreme Court held that supplementing the customary courtroom security
force "by four uniformed state troopers sitting in the first row of the spectator's section" did not deprive
the defendant of his constitutional right to a fair trial. See Holbrook, 106 S.Ct. at 1342, 1347. Holbrook
distinguished several cases that involved some type of state action like shackling a defendant during trial
that branded the defendant in the jury's eyes "with an unmistakable mark of guilt" or created "the
impression in the minds of the jury that the defendant [was] dangerous or untrustworthy." See Holbrook,
106 S.Ct. at 1346-47. Here, the presence of the uniformed officers in the courtroom merely showed their
solidarity and support for a fellow slain officer.

 Also, this case is distinguishable from appellant's cited case of Woods v. Dugger because, among
other things, there is no evidence that any of appellant's jurors had close ties to law enforcement. See
Woods v. Dugger, 923 F.2d 1454 (11th Cir. 1991) (presence in courtroom of spectator prison guards in
case where defendant was charged with murdering a prison guard was inherently prejudicial in part because
some of the jurors "had either worked in the prison system or had relatives currently working in the prison
system"); Howard, 941 S.W.2d at 118 n.15 (also distinguishing Dugger). We decline to hold that the
mere presence of uniformed officers in the courtroom created an atmosphere that "inherently lack[ed] due
process." See Howard, 941 S.W.2d at 118. Point of error one is overruled.

 In point of error two, appellant claims that the trial court should have granted a mistrial "in response
to prosecutorial argument comparing appellant's offense to the terrorist acts of September 11, 2001." In
point of error three, appellant claims that his lawyer was ineffective for not objecting to prosecutorial
argument calling him "the embodiment of evil" and comparing him to terrorists.

 The record from the punishment hearing reflects that the trial court sustained appellant's objection
to, and instructed the jury to disregard, the prosecution's jury argument that many people for the first time
appreciate the value of the police since the events of 9/11. The trial court, however, denied appellant's
motion for a mistrial because of this argument. (4)

 [PROSECUTION]: I want to digress a little bit and talk to you about something larger
than [appellant] because this is about his guilt and about his punishment, but it has larger
ramifications. Every one of us experienced the tragedy of September 11th and many
people for the first time, for the first time appreciated the value of our firefighters and our
police-


 [APPELLANT]: Excuse me, Your Honor. I'm going to object to this as an improper plea
for law enforcement.


 [THE COURT]: Sustained.


 [APPELLANT]: Ask that the jury be instructed to disregard.


 [THE COURT]: Jury will disregard.


 [APPELLANT]: Respectfully move for a mistrial.


 [THE COURT]: Denied.


 The record reflects that the prosecution then made the following argument to which appellant did
not object or otherwise complain.

 [PROSECUTION]: Well, it doesn't go to that, Mr. Cunningham, because it goes to the
fact that what really we learned from September 11th is that evil exists in this world. If we
didn't know it before, we know it now. And we know the embodiment of evil came out
and has manifested itself in [appellant].

 

 Appellant's failure to complain about this argument at trial forfeited any appellate claim that the
argument was improper. See Cockrell v. State, 933 S.W.2d 73, 88-89 (Tex.Cr.App. 1996), cert.
denied, 117 S.Ct. 1442 (1997). Appellant nevertheless claims that his lawyer was ineffective for not
objecting to the argument because this "outrageous, ludicrous argument should have drawn an objection,
but did not." We have held several times in cases where an ineffective assistance of counsel claim is raised
for the first time on direct appeal that "the record on direct appeal is simply undeveloped and cannot
adequately reflect the failings of trial counsel." See, e.g., Thompson v. State, 9 S.W.3d 808, 813-14
(Tex.Cr.App. 1999); see also Massaro v. United States, 123 S.Ct. 1690, 1694 (2003) (when ineffective
assistance of counsel claim is raised for first time on direct appeal, "appellate counsel and the court must
proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus
often incomplete or inadequate for this purpose"). The record in this case is insufficient to support a
conclusion that appellant's lawyer was ineffective for not objecting to the prosecution's closing jury
argument. See Thompson, 9 S.W.3d at 815.

 In any event, we do not agree with appellant's characterization of the argument as inviting the jury
to "use [appellant] as a scapegoat for the most horrible act of terrorism in modern times" and as suggesting
to the jury that appellant was somehow tied to the events of 9/11. Considered in their totality, these
arguments emphasized the value of police officers and suggested that killing a police officer in the lawful
discharge of his duties by senselessly shooting him numerous times is the embodiment of evil. This was a
proper summation of, and reasonable deduction from, the evidence. See Wesbrook v. State, 29 S.W.3d
103, 115 (Tex.Cr.App. 2000), cert. denied, 121 S.Ct. 1407 (2001) (summation of, and reasonable
deductions from, the evidence are proper areas of jury argument).

 In addition, any error in the argument was harmless under state law because, at most, it "had but
a slight effect" on the jury. See Solomon v. State, 49 S.W.3d 356, 365 (Tex.Cr.App. 2001). And, as
a matter of federal constitutional law, we are unable to conclude that an objection to the argument by
appellant's lawyer would have changed the result of the sentencing proceeding. See Williams v. Taylor,
120 S.Ct. 1495, 1511-12 (2000) (defendant claiming ineffective assistance of counsel must show that "but
for counsel's unprofessional errors, the result of the proceeding would have been different"). Points of
error two and three are overruled.

 In point of error four, appellant claims that his lawyer was ineffective for not objecting to the
following prosecution jury argument at the punishment hearing.

 The defense tells you, you know, this is just about [appellant] and he can serve out his life
in prison. But think about something. Let's think about the effect that your sentence is
going to have on the people that [appellant] runs with, the Rosarios, the Greenlees, these
other folks. How tempting is it to them to take a gun with them if they think they might be
confronted by the police?


 There are people who will argue to you that the death penalty is not a deterrent, but you
know when you really think about it in one way, the death penalty is the reason we erect
lighthouses on rocky, dangerous coasts. Yeah, you're going to hear about the shipwrecks. 
You're going to hear about the Robert Gene Wills. You're not going to hear about the
people who heeded the searchlight and made it to harbor safely. The - there's no
deterrent effect. You can't predict a negative event.

 

 Here, the record is insufficient to support a conclusion that appellant's lawyer was ineffective for
not objecting to this argument. See Thompson, 9 S.W.3d at 815. Point of error four is overruled.

 In point of error six, appellant claims that the failure to define "society" in the future-dangerousness
special issue "resulted in a sentence of death in violation of appellant's rights under the Eighth and
Fourteenth Amendments." We have resolved this claim adversely to appellant. See Ladd v. State, 3
S.W.3d 547, 572-73 (Tex.Cr.App. 1999), cert. denied, 120 S.Ct. 1680 (2000). Point of error six is
overruled.

 In point of error seven, appellant claims that the trial court committed constitutional error in refusing
his requested instruction "telling the jurors that the burden of proof on the [future dangerousness] special
issue incorporated the same burden of proof on extraneous offenses, that they had to find beyond a
reasonable doubt that appellant had committed any extraneous offense before they could consider it in
answering any special issue" (emphasis in original). We have resolved this claim adversely to appellant. 
See Ladd, 3 S.W.3d at 574-75 (as long as punishment charge requires state to prove special issues, other
than the mitigation issue, beyond a reasonable doubt, there is no unfairness in not having a burden of proof
instruction concerning extraneous offenses).

 Appellant, however, claims that, under the Supreme Court's decision in Ring v. Arizona, 122
S.Ct. 2428 (2000), jurors must be instructed that the prosecution has the burden to prove extraneous
offenses beyond a reasonable doubt. In Apprendi v. New Jersey, the Supreme Court held, "[o]ther than
the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable doubt." See Apprendi v. New
Jersey, 120 S.Ct. 2348, 2362-63 (2000). In Ring, the Supreme Court decided that Apprendi also
required a holding that a jury (not a judge sitting without a jury) must find any aggravating circumstances
necessary for imposition of the death penalty. See Ring, 122 S.Ct. at 2443.

 In this case, the jury was instructed that the prosecution had the burden to prove the future-dangerousness special issue beyond a reasonable doubt, and the jury was also required to make the critical
finding on that issue. This satisfies the requirements of Apprendi and Ring. See also Jackson v. State,
992 S.W.2d 469, 477 (Tex.Cr.App. 1999) (in capital cases where jury is statutorily charged that
prosecution must prove future-dangerousness issue beyond a reasonable doubt, no burden of proof
instruction concerning extraneous offenses is required). Point of error seven is overruled.

 In point of error eight, appellant claims that the future-dangerousness special issue was
unconstitutionally applied to him "because that issue was not susceptible to proof beyond a reasonable
doubt and the jury could not apply the rule for decision (beyond a reasonable doubt) in the context of the
punishment question." We understand appellant to argue that the possibility that a life-sentenced appellant
might escape or make parole "has the inevitable effect of reducing the prosecution's burden of proof [on
the future-dangerousness special issue] to virtually zero." He further argues that the "jurors will interpret
a reasonable doubt to mean any tiny degree of doubt, because they are not willing to tolerate any risk, at
whatever time, of the Defendant's release." (Emphasis in original). In support of this claim, appellant relies
on double hearsay-his investigator's affidavit (also discussed in point of error seventeen) containing the
investigator's out-of-court statements relating juror Martinez' out-of-court statements that "in considering
the [future-dangerousness] special issue, the jurors considered the possibility that [appellant] might escape"
and "the jurors were pretty sure, from defense counsel's arguments, that [appellant] would probably never
be released from prison."

 In this case, the jury was instructed that a life-sentenced appellant would not be eligible for parole
for 40 years and that "eligibility for parole does not guarantee that parole will be granted." The record
further reflects that any mention of the possibility of escape first arose during the prosecution's cross-examination of appellant's criminal-justice expert without any objection from appellant. The prosecution
asked the professor whether his statistical data included "the Texas 7" which refers to 7 non-capital prison
inmates who had escaped from the Texas prison system and went on a crime spree that included the
murder of a Dallas police officer.

 Q. So, your studies began after that?


 A. These data were collected after that time frame, yes.


 Q. I guess before the escape of the Texas 7?


 A. That's correct.


 The professor testified on redirect examination about changes that have taken place in the prison
system in response to the escape of the Texas 7.

 Q. What changes have taken place?


 A. The prison system has increased its security and its concern around escapes, which was
what the Texas 7 was about, and if I can-the institutional misconduct of the Texas 7 is
included in the data that we're talking about. What they did when they escaped is not. 
The data we looked at doesn't look at what happens when somebody gets out. So, the
conduct of those people while they were incarcerated does fall within the range of the data
we have.


 The Texas 7 were again mentioned during the prosecution's recross-examination of the professor.

 Q. [PROSECUTION]: Dr. Longmire, I guess, based on your testimony, you would have
been able to tell, I guess the public, the jury that the Texas 7 wouldn't have done what they
did when they got out, based on your tables?


 [APPELLANT]: I object, Your Honor. I never asked him to predict as to this individual
or any other inmate.


 [THE COURT]: Sustained.


 Q. [PROSECUTION]: Well, Dr. Longmire, you just stated that you included in this
institutional study-


 [APPELLANT]: I renew my objection, Your Honor.


 [THE COURT]: Let her finish her question.


 Q. [PROSECUTION]: -in this institutional study all the behavior of the Texas 7, correct?


 A. To the extent that any of them were incarcerated for murder, yes.


 Q. [PROSECUTION]: All right.


 [APPELLANT]: Well, I - hold on, hold on. I'm going to object because they weren't in
even for murder, Your Honor. Not all - she's categorizing seven people. If she wants to
go through them individually and ask him what applied to his study, this would be different;
but they weren't all in for that offense. One was a sexual assault.


 [THE COURT]: All right. Counsel, why don't you finish asking your question.


 Let her finish asking her question and then I'll rule.


 [APPELLANT]: Okay.


 Q. [PROSECUTION]: Dr. Longmire, you're the one who just brought up the fact that
members of the Texas 7 were included in this study, correct?


 A. Those who were convicted of murder would have been included in this study, yes.


 Q. [PROSECUTION]: I'm assuming based on your familiarity -


 [APPELLANT]: I'm going to use her objection to relevancy because we haven't been
able to go into what the studies show.


 [THE COURT]: Sustained.


 [APPELLANT]: Thank you.


 Q. [PROSECUTION]: Well, based on your studies, you were prepared then, I assume,
to say that -


 [APPELLANT]: Object to relevance as to, in their case, Your Honor, how it would apply
to this defendant.


 [THE COURT]: Sustained.

 

 Neither party mentioned the possibility of escape during closing jury arguments. The prosecution
did not dispute appellant's assertion during his closing jury arguments that a life-sentenced appellant would
die in prison.

 [APPELLANT]: No matter what your verdict is, [appellant] will be punished and punished
severely. A life sentence is not a slap on the wrist. No matter what your verdict is here,
it ensures that [appellant] will die in prison. It really only decides when he dies and how
he dies, whether he dies of natural causes or dies as a result of an execution.


 We initially note that the trial court had no opportunity to remove the basis of the objections raised
in appellant's claims on appeal because appellant did not raise these objections in the trial court. See Posey
v. State, 966 S.W.2d 57, 62 (Tex.Cr.App. 1998). Appellant has, therefore, procedurally defaulted these
appellate claims. See id.

 In addition, the merits of these claims should be considered in the context of the history of the
legislative mandate requiring the submission of the parole-law jury instruction. Before our Legislature
required this instruction, this Court had consistently held, based on the Texas Constitution, that jurors
should not be informed "of the actual consequences of a life sentence," such as the "possibility of
commutation, pardon, or parole." See generally Smith v. State, 898 S.W.2d 838, 846-53, 849
(Tex.Cr.App. 1995) and at 857-72 (Clinton, J., dissenting), cert. denied, 116 S.Ct. 131 (1995). Several
rationales were advanced in support of this. For example, some believed that injecting parole and other
similar considerations (such as the possibility of escape) into the capital sentencing process would distract
the jury from its main function of making an individualized sentencing determination and would turn this
process, as demonstrated by this case, into "mini-trials on prison space and parole policies." See Smith,
898 S.W.2d at 849 n.16. 

 About the time that the minimum years for parole eligibility on a life sentence were greatly
increased, some believed that it was unfair not to tell a jury that a life-sentenced capital defendant would
serve many years in prison before becoming eligible for parole. See Smith, 898 S.W.2d at 857-72
(Clinton, J., dissenting) (explaining how minimum parole eligibility could be considered relevant mitigating
evidence). (5) The United States Supreme Court also called the constitutionality of the Texas practice into
question with its decision in Simmons v. South Carolina, which held that the particular defendant in that
case was constitutionally entitled to inform his sentencing jury that a life sentence carried no possibility of
parole, especially in light of the prosecution's argument that that defendant might get out of prison if
sentenced to life. See Simmons v. South Carolina, 114 S.Ct. 2187 (1994); Smith, 898 S.W.2d at 848-53 (distinguishing Simmons).

 It is against this backdrop that our Legislature changed the law to mandate the current jury
instruction that a life-sentenced capital defendant will serve 40 years in prison before becoming eligible for
parole. See Article 37.071, Section 2(e)(2)(B), V.A.C.C.P. This legislatively mandated parole jury
instruction, coupled with appellant putting into issue various prison policies and "actual consequences of
a life sentence," make such things as the possibility of escape a relevant consideration to the future-dangerousness special issue. See Smith, 898 S.W.2d at 849 n.16 and at 857-52 (Clinton, J., dissenting);
cf. California v. Ramos, 103 S.Ct. 3446, 3453-58 (1983) (does not violate federal constitution to submit
capital sentencing jury instruction speculating about possible future gubernatorial commutation of life
sentence without possibility of parole because this was relevant to "future dangerousness" and was not too
speculative an element for the jury's consideration). Under these circumstances, we decline to hold that
these valid and relevant considerations have "the inevitable effect of reducing the prosecution's burden of
proof [on the future-dangerousness special issue] to virtually zero." Point of error eight is overruled.

 In point of error nine, appellant claims that, because this Court has held that "victim impact"
evidence is admissible to "rebut" mitigation, omitting a burden of proof in the mitigation special issue is
unconstitutional, especially in light of the Supreme Court's decisions in Apprendi and Ring. We have
decided this claim adversely to appellant. See Blue v. State, 125 S.W.3d 491, 500-01 (Tex.Cr.App.
2003); Resendiz v. State, 112 S.W.3d 541, 549-50 (Tex.Cr.App. 2003); Allen v. State, 108 S.W.3d
281, 285 (Tex.Cr.App. 2003); Prystash v. State, 3 S.W.3d 522, 535-36 (Tex.Cr.App. 1999), cert.
denied, 120 S.Ct. 1840 (2000). Point of error nine is overruled.

 In point of error ten, appellant claims that the mitigation special issue is unconstitutional because
"it makes impossible any meaningful appellate review of the jury's determination." In point of error eleven,
appellant claims that Article 44.251, of the Texas Code of Criminal Procedure, requires that the jury's
answer to the mitigation special issue be subject to appellate review. We have rejected these claims. See
Prystash, 3 S.W.3d at 536; Cockrell v. State, 933 S.W.2d 73, 92 (Tex.Cr.App. 1996), cert. denied,
117 S.Ct. 1442 (1997). Points of error ten and eleven are overruled.

 In point of error twelve, appellant claims that the submission of the "anti-sympathy" jury instruction
at the punishment phase of his trial violated the federal constitution. We have decided this claim adversely
to appellant. See Tong v. State, 25 S.W.3d 707, 710-11 (Tex.Cr.App. 2000), cert. denied, 121 S.Ct.
2196 (2001). Point of error twelve is overruled.

 In point of error thirteen, appellant claims that the trial court violated various federal constitutional
provisions by denying his request for a limiting instruction regarding the proper use of "victim
impact/character evidence." The record reflects that the prosecution's last witness during its punishment
case was the victim's widow, who testified briefly about the impact of his death on the family. This
testimony covers about 14 pages in the reporter's record. Appellant briefly alluded to this evidence during
his closing jury arguments (see discussion of point of error one). The prosecution did not mention it at all
during its closing jury arguments.

 The record also reflects that, at the close of the punishment evidence, the trial court overruled the
following objections that appellant made to the court's jury charge:

 The defendant objects to the Court's failure to instruct the jury that victim character or
impact evidence does not meet or relieve the State of its burden to prove the continuing
threat issue beyond a reasonable doubt.


 The defendant objects to the Court's failure to instruct the jury that jurors are not to use
the victim evidence to make any comparative worth analysis: victim's worth to the
community, or to his family, as compared to other members of society, or victim's worth
compared to worth of the defendant.


 The defendant objects to the Court's failure to instruct the jury to disregard victim impact
evidence that was not shown to be within the knowledge or reasonable expectation of the
defendant.


 We will assume that these objections sufficiently raise the constitutional claims appellant presents
now. However, appellant was not entitled to the first instruction because the jury was instructed that the
prosecution had to prove the future-dangerousness special issue beyond a reasonable doubt. He was not
entitled to the second instruction because it is not constitutionally impermissible to "compare the worth of
a victim to a defendant's worth" or to compare the victim's worth to the community, to his family, or to
other members of society. See Jackson v. State, 33 S.W.3d 828, 834 (Tex.Cr.App. 2000), cert. denied,
121 S.Ct. 2221 (2001). And, he was not entitled to the third instruction because it "is difficult to imagine
how appellant could not have reasonably foreseen the impact that the [victim's] death would have on
others." See Jackson, 33 S.W.3d at 833. Point of error thirteen is overruled.

 In point of error fourteen, appellant claims that the trial court erred in denying his request to clarify
the scope of the statutory mitigation special issue because this special issue unconstitutionally narrowed the
consideration of mitigating evidence to only those facts that reduced appellant's moral blameworthiness. 
We have held that the mitigation special issue does not do this. See Prystash, 3 S.W.3d at 534-35;
Shannon v. State, 942 S.W.2d 591, 597 (Tex.Cr.App. 1996). In addition, our statutory mitigation
special issue is taken almost verbatim from the United States Supreme Court's decision in Penry v.
Lynaugh, 109 S.Ct. 2934, 2947, 2951-52 (1989). We decline to hold that such an instruction is
unconstitutional. Point of error fourteen is overruled.

 In point of error fifteen, appellant claims that the "12-10 Rule" is unconstitutional. In point of error
sixteen, appellant claims that the trial court erred in denying appellant's request to inform the jury that the
failure to answer a special issue would result in a life sentence. We have resolved these and similar claims
adversely to appellant. See Prystash, 3 S.W.3d at 536-37. Points of error fifteen and sixteen are
overruled.

 In point of error seventeen, appellant claims that the trial court reversibly erred "in denying
admission of juror Martinez' testimony on motion for new trial" under Tex.R.Evid. 606(b) which codifies
the general rule that a juror cannot impeach her own verdict. (6) This general rule is a choice between the
lesser of two evils:

 The rule [that a juror cannot impeach her own verdict] is based upon controlling
considerations of a public policy which in these cases chooses the lesser of two evils. 
When the affidavit of a juror, as to the misconduct of himself or the other members of the
jury, is made the basis of a motion for a new trial, the court must choose between
redressing the injury of the private litigant and inflicting the public injury which would result
if jurors were permitted to testify as to what happened in the jury room.

 

 These two conflicting considerations are illustrated in the present case. If the facts were
as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their
verdict, and the defendant ought to have had relief, if the facts could have been proved by
witnesses who were competent to testify in a proceeding to set aside the verdict. But let
it once be established that verdicts solemnly made and publicly returned into court can be
attacked and set aside on the testimony of those who took part in their publication and all
verdicts could be, and many would be, followed by an inquiry in the hope of discovering
something which might invalidate the finding. Jurors would be harassed and beset by the
defeated party in an effort to secure from them evidence of facts which might establish
misconduct sufficient to set aside a verdict. If evidence thus secured could be used, the
result would be to make what was intended to be a private investigation, the constant
subject of public investigation; to the destruction of all frankness and freedom of discussion
and conference.

 

See State ex rel. Rosenthal v. Poe, 98 S.W.3d 194, 202 n.12 (2003) quoting McDonald v. Pless, 35
S.Ct. 783, 784 (1915).


 The record reflects that appellant filed a motion for new trial in which he claimed that the
instructions at the punishment phase "misdirected the jury" in various ways. Appellant attached to his new
trial motion the double hearsay investigator's affidavit referred to in our discussion of point of error eight. 
According to the investigator, juror Martinez stated: (1) that she would have sentenced appellant to life had
there "been no special issues to answer, but just a decision to make: life or death," (2) that, in answering
the "future dangerousness" special issue, the jurors considered the possibility that appellant might escape,
(3) that the jury ultimately rejected various factors as mitigating because "the jurors could not accept them
as an excuse for the crime," and (4) that she wished "that the legislature had put the special issues in reverse
order, so that the jurors would not have to decide whether to give a life sentence to someone for whom
they had just returned a death answer (on the continuing-threat issue)."

 At the motion for new trial hearing, the prosecution objected to the admission of the investigator's
affidavit on hearsay grounds and on the basis that Rule 606(b) excluded it. The trial court sustained the
objection based on Rule 606. We do not reach the Rule 606(b) issue because the trial court could have
excluded the affidavit on hearsay grounds. See Romero v. State, 800 S.W.23d 539, 543-44
(Tex.Cr.App. 1990) (appellate court may uphold trial court's evidentiary ruling if the record supports it and
it is correct on any theory of law applicable to the case even if the trial court gives the wrong reason for its
ruling). Point of error seventeen is overruled.

 We affirm the judgment of the trial court.

 Hervey, J. 

Delivered: April 21, 2004

Do Not Publish
1. The record reflects that the trial court excluded on relevancy grounds the following testimony
contained in appellant's bill of exceptions:


 Okay. We have Dr. Dennis Longmire on the stand. We were asking him about the
Sorenson - and that's S-O-R-E-N-S-O-N - Pilgrim - Pilgram, Pilgram - P-I-L-G-R-A-M - study and this is a study that he's been involved with where they had followed 6,390
individuals incarcerated in the Texas penal system for the offense of murder. I believe they
studied them for a ten-year period of time for a collective total of 29,074 and a half years
served. That based on their findings as a result of following this class of offender, no
guards - I'm sorry. There were no homicides involving guards within the prison system;
however, seven homicides did occur. There were 33 aggravated assaults committed by
these offenders, which was the equivalent of a half of 1 percent. The total rate of violence
of any kind was limited to 2 per hundred inmates. So, 98 out of each 100 inmates serving
terms for murder had not committed acts of violence while incarcerated. I think this data
shows that if the defendant were to operate within the norm, it would certainly be more
likely than not that he would - I should say be more likely that he would not commit
criminal acts of violence while in prison.
2. This actually misstates the inquiry of the "future dangerousness" special issue. It does not ask
whether a defendant is "likely" to be a future danger. It asks whether there is a "probability" that a
defendant will be a future danger. 
3. See Hall v. State, 67 S.W.3d 870, 874 (Tex.Cr.App.), cert. granted, judgment vacated, and case
remanded to this Court for further consideration [in light of Atkins v. Virginia, 122 S.Ct. 2242 (2002)],
Hall v. Texas, 123 S.Ct. 70 (2002). 
4. We do not understand appellant to be complaining on appeal about this ruling. 
5. For example, appellant's lawyer claimed at the hearing on his motion for new trial:


 And those ["future dangerousness" and mitigation special] issues came into being at
different times. It's not as if the legislature drafted those two issues together. So, it's really
probably another case of the defense just making some more bad law, that we fought for
years to be able to tell the jury that defendants would be required to serve 40 years-35
and then 40 years and so now we're caught in a paradoxical position, too, just as the State
is, that we're asking these people to find-of course we'll always hope they'll do what they
did in the Yates case, that they'll find that someone is a not continuing threat but if they do
find yes on that, then we're placed in a hard position, too, of saying even though you found
that, you still need to find that because of mitigation that this person should live, you know,
instead of dying. 
6. Rule 606(b) states:


 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any
matter or statement occurring during the jury's deliberations, or to the effect of anything on
any juror's mind or emotions or mental processes, as influencing any juror's assent to or
dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a
juror concerning any matter about which the juror would be precluded from testifying be
admitted in evidence for any of these purposes. However, a juror may testify: (1) whether
any outside influence was improperly brought to bear upon any juror; or (2) to rebut a
claim that the juror was not qualified to serve.