

## NUMBER 13-14-00134-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

**JOSE FERNANDO CERVANTES,**                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza and Benavides
### Memorandum Opinion by Justice Garza

Appellant, Jose Fernando Cervantes, was convicted of murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 19.02(b)(1) (West, Westlaw through 2013 3d C.S.), and was sentenced to thirty years' imprisonment. On appeal, he argues that the trial court erred by denying his motion to suppress a written statement he made to police. We affirm.

## I. BACKGROUND

On February 6, 2012, Cervantes was interrogated at the Hidalgo County Sheriff's Office regarding the murder of German Duque Gonzalez. Officers, led by Investigator Fernando Tanguma, interviewed Cervantes for over ten hours. Cervantes was not represented by counsel at the time. During the course of the interview, Cervantes initialed and signed a document acknowledging and waiving his *Miranda* rights, *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West, Westlaw through 2013 3d C.S.); *Miranda v. Arizona*, 384 U.S. 436 (1966), as well as a written statement regarding the events surrounding Gonzalez's murder.

The following is a summary of the content of Cervantes's written statement to police. Cervantes lives in Mission, Texas with his common-law wife and six-year-old son. He used to work at a bakery in Mission along with co-workers Gonzalez and Benito.[1] Gonzalez and Benito argued frequently. Later, Benito began working at a different bakery in Roma, Texas. About a month before the police interview, Benito came to Cervantes's house and asked how Cervantes was doing at work. Benito also asked what Gonzalez was doing at the bakery. Cervantes told Benito that Gonzalez baked donuts and opened the bakery in the morning. Benito then asked Cervantes to come to Reynosa, Tamaulipas, Mexico to "do a job with him." Benito did not explain what the job was. Cervantes declined.

On January 27, 2012, Benito returned to Cervantes's house and asked Cervantes "to go to Reynosa with him and to get some drugs and come back right away." Benito was using cocaine at the time. Benito asked Cervantes if he knew where Gonzalez lived;

---

[1] Benito's last name is unclear from the record.

Cervantes replied that he did not know. Benito told Cervantes that he intended to kidnap Gonzalez's son but he did not know where Gonzalez's son lived; Cervantes advised Benito that he also did not know where Gonzalez's son lived. Benito told Cervantes that he intended to kidnap Gonzalez's son-in-law "because they had a large stash of drugs in Mexico."

At that point, according to Cervantes's statement, Benito "grabbed [Cervantes's] right arm and told [Cervantes] that [he] was going to help him kidnap [Gonzalez]." Benito said he wanted to kidnap Gonzalez at the bakery in Mission and that all Cervantes had to do was get Gonzalez to exit through the bakery's back door. Benito then showed Cervantes two guns he had in the back seat of his car. Benito told Cervantes that he had used the guns before and was not afraid of using them. Benito asked Cervantes again if he knew where Gonzalez lived, and Cervantes again replied that he did not know. Benito then asked if Cervantes knew which road Gonzalez used to drive to work; Cervantes replied that Gonzalez used Inspiration Road. According to Cervantes's statement, Benito threatened to kill Cervantes's wife and son if Cervantes "said anything" about the plan to kidnap Gonzalez.

Cervantes's statement sets forth that, on January 31, 2012, Benito came to Cervantes's house in a green Kia SUV accompanied by a male passenger unknown to Cervantes. Benito instructed Cervantes to meet up at Schuerbach Road and 3 Mile Line. Cervantes stated: "Benito told me that I better be where he asked me to meet him or he would kill my family. I agreed to meet Benito because he threatened me and my family." Cervantes drove to the specified location, where he saw the green Kia parked along the side of the road. Cervantes stated that he overheard the passenger of the Kia telling

3

Benito that "it better work or we will lynch him." Cervantes believed the passenger was referring to him.

Benito and his passenger stepped out of the Kia and got into Cervantes's car. Benito instructed Cervantes to drive south on Inspiration Road and to park the car by the side of the road. Cervantes did so. At some point, Gonzalez's Mercury Grand Marquis passed by the group heading south. Cervantes attempted to get Gonzalez's attention but Gonzalez kept driving. Subsequently, Gonzalez's car returned, heading north. Gonzalez made a U-turn and parked behind Cervantes. According to Cervantes's statement, as soon as Gonzalez unlocked his car doors, Benito and his associate jumped into Gonzalez's Grand Marquis. Cervantes exited his car and observed that Benito had begun to pull Gonzalez into the back seat of the Grand Marquis. Benito's associate got into the driver's seat. Benito instructed Cervantes to get in the Grand Marquis; Cervantes did so. The group then proceeded north on Inspiration Road. Cervantes said that, at one point, Gonzalez attempted to get up from the back seat and yelled "*tengo una navaja*," which Cervantes understood to mean that Gonzalez had a knife. Benito's associate then "turned towards [Gonzalez] and started punching [him] several times on the chest using his left fist." Cervantes stated that he observed Benito "holding on to [Gonzalez] from his neck in a choking manner using his arms." Gonzalez, still attempting to get up from the back seat, "launched himself towards [Cervantes]" and "grabbed" him, scratching Cervantes with his fingernails. Benito pulled Gonzalez back into the back seat and resumed punching him.

Cervantes relates in his written statement that he could hear someone in the back seat choking and having a hard time breathing. He heard Benito's associate instruct

4

Benito to choke Gonzalez. Cervantes stated that "Benito's friend[] then looked at me and told me that if I ran he would shoot me." Cervantes heard nothing further from Gonzalez. Benito's associate asked where they could "throw the body." Cervantes said that he knew of a place, and he drove the men to his brother's property elsewhere in Mission. When they arrived, Benito's associate got out of the car and opened the rear passenger door, and Benito said that "[Gonzalez] was stuck." Cervantes "walked around to the rear passenger door and saw Benito's friend removing the rear passenger seat belt that [Gonzalez] had wrapped around his neck."

Cervantes stated that the other two men removed Gonzalez's body from the car and placed it near a tree. Cervantes placed a jacket and several tires over the body to conceal it. The men then left the scene. According to Cervantes's written statement, Benito's associate told him "not to say anything to anyone or else they were going to kill my family." Cervantes averred: "Benito's friend then showed me the guns he had in the [Kia] and pointed one of the guns and told me this was real. Benito told me not to do anything stupid and they left."

The written statement indicated that the questioning of Cervantes started at 7:29 p.m. on February 6, 2012 and ended at 5:30 a.m. the following morning.

Cervantes was subsequently charged with capital murder. *See* TEX. PENAL CODE ANN. § 19.03 (West, Westlaw through 2013 3d C.S.).[2] Prior to trial, Cervantes filed

---

[2] The indictment set forth six counts of capital murder. The first three counts alleged that Cervantes intentionally caused Gonzalez's death by strangling him with his arm, strangling him with an unknown object, and striking him with an unknown object, respectively, and that Cervantes was in the course of committing or attempting to commit kidnapping. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West, Westlaw through 2013 3d C.S.) (stating that a person commits capital murder if the person intentionally commits a murder "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat"). The final three counts were identical to the first three counts except that they alleged Cervantes was in the course of committing or attempting to commit robbery. *See id.*

motions to suppress the written statement, claiming that the *Miranda* waiver and the statement itself were made involuntarily and did not conform to the requirements of article 38.22 of the code of criminal procedure or the United States Constitution. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2. After a hearing on April 5, 2013, the trial court denied the motion. The trial court later entered findings of fact and conclusions of law which state in relevant part as follows:

## II.

The Court finds that the Defendant on February 6, 2012, agreed voluntarily to go with Inv. Fernando Tanguma to the Hidalgo County Sheriff's Office, and that the Defendant had a choice and was not under coercion or duress when he elected to go with Inv. Fernando Tanguma. . . . The Court finds that the Defendant was informed by the investigator that the Defendant was a person of interest relating to the murder investigation of German Duque Gonzalez. The Court finds that by the conclusion of the making of the Defendant's statement of accused, Defendant's liberty was restrained to a level consistent with formal arrest.

## III.

The Court finds that immediately upon his arrest, the defendant was advised of his rights and given certain warnings that comported in all respects with the Constitution and laws of the United States of America and of the State of Texas.

## IV.

The Court further finds that after being so duly warned, the defendant made a written statement which was inculpatory as to the said defendant. The Court finds that the Defendant's primary spoken language is the English language, and that the Defendant was duly warned by Inv. Fernando Tanguma in the Defendant's primary spoken language. That the Defendant was not compelled to answer questions from Inv. Fernando Tanguma or other law enforcement officials during the interrogation of the Defendant.

## IV. [sic]

The Court further finds from viewing, in its totality, all the circumstances surrounding the making of this statement, that the defendant, at the time of making thereof, understood the rights of which he had been advised, and

6

further that the defendant knowingly and intelligently waived these rights. The totality of circumstances includes, but is not limited to: the defendant's apparent intelligence, his ability to articulate his thoughts (be they truthful or perjurous), the information within the knowledge of the defendant as to the nature of the crime and the investigation therearound, the knowledge on the part of the defendant as to this [sic] right to counsel and his right to avail himself of counsel as well as his right to continue or discontinue any interview with law enforcement officials, the degree, if any, to which the defendant was held incommunicado prior to the making of the instant statement, the method of interrogation used by the officers, including duration, location, and technique of questioning.

. . . .

## VI.

The Court finds that the degree to which the defendant was in a state of fright, if he was, was not attributable to the acts or omissions of the custodial authorities. The Court further finds that even if Inv. Fernando Tanguma made comments regarding the possibility of a death sentence in connection with the murder of German Duque Gonzalez, that the comment was not a particular action against the accused but merely underscored the gravity of the murder investigation.

## VII.

The Court finds that the Defendant's Written statement of accused . . . was in all things voluntary and was made by the defendant with full knowledge of his rights and consequences of making such a statement. The Court finds that the Defendant did not request an attorney or ask that the interview cease, and finds that no investigator threatened the Defendant in providing a statement. The Court finds that no investigator promised the Defendant anything in exchange for the Defendant's statement, and that the Defendant was not denied restroom or food. The Court finds that Inv. Fernando Tanguma asked the Defendant if he needed water, or go to the restroom, and the Defendant did not request anything to eat or drink, or go to the restroom. The Court finds that the Defendant did request a cigarette break and that Inv. Fernando Tanguma granted the Defendant's request for a cigarette break. The Court finds that the Defendant was not under the influence of alcohol or narcotic[s] at the time of providing the statement.

## VIII.

The Court finds that Inv. Fernando Tanguma provided the Defendant the opportunity to review and if necessary revise his statement. The Court finds that the Defendant signed his statement of accussed [sic], upon completion,

in the presence of the investigator.

At trial, Cervantes again objected to the admission of the statement and the trial court overruled the objection.

Later, Cervantes testified on his own behalf. His trial testimony differed significantly from his written statement. In particular, Cervantes testified at trial that he was driving with his niece when Gonzalez's car approached and Gonzalez asked Cervantes who was sitting next to him in the car. Cervantes stated that he and Gonzalez frequently used the services of prostitutes at Cervantes's brother's property. They both drove to the property, at which point Cervantes left his niece in his car so he could "[l]ook for the prostitute." When he returned, he saw that his niece was with Gonzalez in the back seat of Gonzalez's car. According to Cervantes, Gonzalez was "grabbing" his niece "by her thighs, her legs," and she "started screaming [Cervantes's] name" and yelling "help me." Believing his niece was being attacked, Cervantes "confronted" Gonzalez. Cervantes's niece managed to escape. Cervantes testified that Gonzalez grabbed his arm and Cervantes pulled his arm back, resulting in a scratch. Cervantes heard Gonzalez say "[y]ou don't know who you're messing with." Cervantes lost his balance and ended up in the back seat of the car. The men continued "punching each other and hitting each other." Cervantes stated that Gonzalez "was throwing kicks with his knees" and he thought Gonzalez tried to grab something, at which point Cervantes "panicked" and pressed his forearm on Gonzalez's chest. Eventually Gonzalez stopped moving, though his eyes were open. Cervantes realized Gonzalez was dead. He removed the body from the car, put it on the ground, and placed a jacket and tires over it. He hid Gonzalez's car in an alleyway. Cervantes testified it was not his intention to kill Gonzalez; he did not

8

know he was killing Gonzalez; and he did not know that his behavior could have caused Gonzalez's death.

Cervantes testified that his initials and signature appear on State's Exhibit 94, the written waiver of *Miranda* rights, but he stated that he did not know what he was signing and that he did so only because the investigator told him he would get "the chair" if he did not. As to State's Exhibit 95, the written statement, Cervantes denied that the signatures appearing on the bottom of each page were his. He said the investigator typed up the statement himself; he agreed with the investigator because he "just wanted it to be over with." He denied ever telling investigators that Gonzalez had a large stash of drugs in Mexico; that he strangled Gonzalez with a seat belt; that he had been "threatened under penalty of death to [him] and [his] family" if he did not participate in the murder of Gonzalez; or that he pulled over to the side of the road to wait for Gonzalez because he knew Gonzalez's work routine.

Forensic experts testified that the DNA of both Cervantes and Gonzalez was found on Gonzalez's pants. Additionally, Gonzalez's DNA was found on a shoe which had been placed on top of the tires covering Gonzalez's body; and Cervantes's DNA was found on the steering wheel, door handle, and gear shift of Gonzalez's car, as well as under Gonzalez's fingernails.

The jury was instructed on the indicted offense of capital murder as well as the lesser-included offenses of murder and manslaughter. The jury was also instructed on the law of parties and the justification of self-defense. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West, Westlaw though 2013 3d C.S.) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or

9

assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."); *id.* § 9.31 (West, Westlaw though 2013 3d C.S.) (providing generally that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force"). Cervantes was convicted of murder, *see id.* § 19.02(b)(1), and this appeal followed.

## II. DISCUSSION

By five issues, Cervantes challenges the trial court's denial of his motion to suppress.[3] In particular, he argues: (1) by his second issue that his statement was involuntarily given "in light of uncontroverted testimony that he was threatened by law enforcement agents with the death penalty if he did not confess"; (2) by his third issue that his statement was involuntarily given "in light of uncontroverted testimony that he was threatened by law enforcement agents to prosecute his wife and remand his children to CPS custody if he did not confess"; (3) by his fourth issue that his waiver of *Miranda* rights was involuntary; (4) by his fifth issue that his waiver of *Miranda* rights failed to comply with statutory requirements; and (5) by his sixth issue that his *Miranda* waiver was

---

[3] Cervantes's first issue on appeal contends that the trial court erred by failing to issue findings of fact and conclusions of law as to its suppression ruling. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West, Westlaw through 2013 3d C.S.). Although defense counsel neither requested findings and conclusions nor objected to their absence, the Texas Court of Criminal Appeals has held that suppression findings and conclusions are mandatory even when "neither party requested written findings at any level of the proceedings, and the issue was not considered by the lower court." *Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013) (noting that article 38.22, section 6 is "mandatory in its language and . . . requires a trial court to file its findings of fact and conclusions of law regarding the voluntariness of a confession whether or not the defendant objects to the absence of such omitted filing" (internal quotations omitted)) (overruling *State v. Terrazas*, 4 S.W.3d 720, 728 (Tex. Crim. App. 1999) ("The 'right' to findings and conclusions [under section 6, article 38.22] is a statutory 'right' which is forfeited by a party's failure to insist upon its implementation.")). Accordingly, we abated the appeal for entry of findings and conclusions pursuant to *Vasquez*. Such findings and conclusions were filed with this Court on October 2, 2014. We therefore reinstate the appeal and overrule Cervantes's first issue as moot.

involuntary because "the officer explaining the *Miranda* rights admitted that he did not himself understand what *Miranda* rights are."

## A.    Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review.  *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)).  We "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor."  *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor."  *Id.*  On the other hand, we conduct a de novo review of evidence when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor.  *St. George*, 237 S.W.3d at 725 (citing *Guzman*, 955 S.W.2d at 89).

We review the trial court's decision for an abuse of discretion.  *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).  "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement."  *Id.*  The trial court's ruling will be upheld if it "is reasonably supported by the record and is correct on any theory of law applicable to the case."  *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

## B.    Applicable Law

11

Article 38.21 of the Texas Code of Criminal Procedure provides that an accused's statement may be used in evidence against him only "if it appears that the same was freely and voluntarily made without coercion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West, Westlaw through 2013 3d C.S.). Article 38.22, section 2 provides that "[n]o written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement" that:

(a) the accused, prior to making the statement, . . . received from the person to whom the statement is made a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time[4]; and

(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

*Id.* art. 38.22, § 2.

In determining under these statutes whether a statement was made voluntarily, we may consider whether there was coercive police conduct, as well as factors such as the

---

[4] With the exception of number five, these are the same warnings as required under *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

suspect's youth, intoxication, mental illness, or other disability. *Oursbourn v. State*, 259 S.W.3d 159, 172–73 (Tex. Crim. App. 2008). Voluntariness is measured according to the totality of the circumstances. *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989).[5]

## C. Analysis

### 1. Voluntariness

By his second and third issues, Cervantes contends that his written statement was involuntarily given "in light of uncontroverted testimony that he was threatened by law enforcement agents with the death penalty if he did not confess" and "in light of uncontroverted testimony that he was threatened by law enforcement agents to prosecute his wife and remand his children to CPS custody if he did not confess."

Cervantes refers by these arguments to testimony he gave at the suppression hearing that Tanguma stated the following during the interrogation: "[Y]ou better—you—you want to take the rap? That's fine. You won't be able to see your son and they're going to give you the chair or probably, if you get a good lawyer, you might have life sentence." Cervantes also testified that officers told him his wife "was detained, too" and that "if I didn't speak something or say something because they can take my—put my wife in jail and take my kids." According to Cervantes's testimony, this statement made him

---

[5] A written confession is involuntary under the federal Due Process Clause only "if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1999). Absent coercive police activity, a statement is not involuntary within the meaning of the Due Process Clause, even if it was not the product of a meaningful choice by the maker. *Id.* at 212 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). Cervantes does not cite the federal Due Process Clause on appeal. Accordingly, we analyze his issues only under the code of criminal procedure provisions set forth above. Claims of involuntariness under the code of criminal procedure can be, but need not be, predicated on police overreaching of the sort required under due-process analysis. *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008).

13

"scared" that he would not see his son or wife again. He agreed with defense counsel that this fear was "why [he] told [the investigator] what he wanted to hear."

At the suppression hearing, Tanguma testified that he went to Cervantes's home on February 1, 2012, and asked him to "come in [to the sheriff's office] and look at some pictures." Tanguma conceded that, in fact, he knew that Cervantes was a person of interest in Gonzalez's murder and that he actually intended to interrogate Cervantes and elicit incriminating responses from him. Cervantes agreed to cooperate and rode in the officer's vehicle to the sheriff's office. Tanguma brought Cervantes to an interview room, where they were joined by another investigator. Tanguma testified that he advised Cervantes of his *Miranda* rights and that Cervantes agreed to waive those rights. At some point, Tanguma advised Cervantes that Cervantes's two brothers were also at the sheriff's office at that time and that they were also being interrogated by deputies.

According to Tanguma, Cervantes never requested an attorney, nor did he ask for the interview to stop. Tanguma denied coercing or threatening Cervantes into giving a statement. He denied promising anything to Cervantes, either directly or indirectly, in exchange for Cervantes's statement. Tanguma testified that he did not deny Cervantes any "basic necessities such as rest room, food or cigarettes," and he denied that Cervantes was under the influence of any narcotic, drug, or alcohol at the time of the interview. He testified that, after the interview, Cervantes voluntarily agreed to provide a written statement and that, after Tanguma typed up the statement, Cervantes signed each page. Tanguma stated that he advised Cervantes that he could make additions,

14

alterations, or deletions to the statement.[6] He stated that it appeared to him at all times that Cervantes understood and spoke the English language.

On cross-examination at the suppression hearing, when defense counsel asked Tanguma "And you also told [Cervantes] that he was going to get the chair, isn't that true?", Tanguma replied: "I don't recall telling him that, sir." Tanguma also could not recall if he told Cervantes "if you don't come clean and tell us what you know, we're going to come down on your wife and your kids are going to get taken away."[7] Tanguma agreed with defense counsel, however, that "[i]f evidence of that were to come out," he "would not be able to contradict" it.

During cross-examination at trial,[8] Tanguma acknowledged that Cervantes did not eat or drink anything during the ten hours of questioning. Tanguma explained that the ten hours consisted of two phases: an "interview" phase where Tanguma and Cervantes "talked about life and a lot of things," and an "interrogation" phase where Tanguma questioned Cervantes about Gonzalez's murder. Later during cross-examination, the following colloquy occurred:

---

[6] At the suppression hearing, Tanguma testified that Cervantes declined to make any changes to his written statement. At trial, Tanguma testified that he could not recall whether Cervantes requested that any changes be made.

[7] When asked on direct examination whether he "ever use[d] the fact of [Cervantes's] relationship with his wife as a means of coercion to give you a confession that wasn't otherwise true," Tanguma did not explicitly deny having done so. Instead, he stated: "I explained to him that his wife was there and she was being questioned also on the case."

[8] The State argues that Cervantes "cannot properly point to evidence developed subsequent to the trial court's ruling as grounds to support his challenge because this evidence was not before the trial court at the time the ruling was made." The Texas Court of Criminal Appeals has held that review of a suppression ruling is ordinarily "limited to the record produced at the suppression hearing" but that, "when the parties subsequently re-litigate the suppression issue at the trial on the merits, we consider all evidence, from both the pre-trial hearing and the trial, in our review of the trial court's determination." *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). Here, the jury was instructed in the charge to "wholly disregard" the written statement if it had a reasonable doubt as to whether the statement was "freely and voluntarily made without compulsion or persuasion." Accordingly, the parties re-litigated the suppression issue at trial, and we will consider trial testimony in our evaluation of Cervantes's issues. *See id.*

15

Q. [Defense counsel]    Now, you have made mention that there was an interview and there was an interrogation?

A. [Tanguma]    Yes, sir.

Q.    So during the interview, I suspect, is when you all talked about life, things and what not, correct?

A.    Yes, sir.

Q.    And it was during the interrogation that you told Mr. Cervantes that his children would be taken into the custody of Child Protective Services and his wife would be arrested, correct?

A.    Yes, sir.

Q.    And that's also when you told Mr. Cervantes, your brothers have already put the finger on you; isn't that when you told him that?

A.    Yes, because he's lying to me.

Q.    You told Mr. Cervantes that he was going to go to prison for the rest of his life and his wife was going to go to prison with him; isn't that true?

A.    I don't recall that.

In support of his argument that Tanguma's actions rendered his statement involuntary, Cervantes cites *Sherman v. State*, a 1976 case where the court of criminal appeals held that a confession was involuntary because the appellant signed it only upon being promised by the police that they would not seek the death penalty if he provided a statement. 532 S.W.2d 634, 636 (Tex. Crim. App. 1976). Cervantes distinguishes *Freeman v. State*, where the court of criminal appeals held that a confession was voluntary when the defendant "expresse[d] a fear of prosecution for some offense for which he actually cannot be prosecuted and the State explain[ed] that he cannot be prosecuted for the feared offense, and the defendant then confesse[d]." 723 S.W.2d 727,

16

731 (Tex. Crim. App. 1986). The *Freeman* Court noted that, "[j]ust because a defendant thinks he has benefitted because his anxiety is quelled does not reflect a promise of some benefit from the State. The benefit lay in the facts of the case not in the actions of the police." *Id.* The Court held that the case "is not like those where the police promise not to seek the death penalty if the defendant gives a statement," such as *Sherman*; nor is the case "similar to a case in which the State offers to reduce the charge if the defendant gives a statement." *Id.*

In reply, the State contends that *Sherman* is inapposite because "[i]n the instant case, no promise akin to 'if you confess, I'll make sure you don't go to death row' was made." However, as noted, Tanguma conceded at trial that he told Cervantes during the interrogation phase of questioning that "his children would be taken into the custody of Child Protective Services and his wife would be arrested." There appears to be no legitimate reason for the officer to have made this remark; the record does not indicate that Cervantes's wife was implicated in any way in Gonzalez's murder, and so advising Cervantes of his wife's potential incarceration and the potential removal of his children is not "merely put[ting] Appellant on notice as to the gravity of the case," as the State contends. This would not be a situation such as the one encountered in *Freeman* where "[t]he benefit lay in the facts of the case not in the actions of the police." *See Freeman*, 723 S.W.2d at 731. Rather, the remark would be akin to the one at issue in *Sherman*, in that it arguably constitutes an implicit promise that Cervantes's wife would not be arrested if Cervantes agreed to make a statement.

Courts have recognized that evidence of threats made against family members of an accused may result in the accused's confession being deemed involuntary. In

17

*Contreras v. State*, the Texas Court of Criminal Appeals found that there was a fact issue as to voluntariness because, as here, (1) there was evidence that police threatened to arrest appellant's wife if he did not cooperate, and (2) there was no probable cause for the officers to have arrested appellant's wife. 312 S.W.3d 566, 576 (Tex. Crim. App. 2010). In *Harris v. State*, the United States Supreme Court found a confession involuntary when an investigator "threatened to arrest [the accused]'s mother for handling stolen property." 338 U.S. 68, 70 (1949). The accused replied, "Don't get my mother mixed up in it and I will tell you the truth," after which he made a confession. *Id.* The Court's ruling that the confession was involuntary was based on the "systematic persistence of interrogation, the length of the periods of questioning, the failure to advise the petitioner of his rights, the absence of friends or disinterested persons, and the character of the defendant [as illiterate]." *Id.* In *Lynumn v. State*, a confession was held to be involuntary because it "was made only after the police had told [the accused] that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" 372 U.S. 528, 534 (1963).

We believe these cases are distinguishable. In *Contreras*, the issue was whether a fact issue was raised so as to warrant the submission of a jury instruction on voluntariness. Here, on the other hand, there is no dispute that there was a *fact issue* as to whether Cervantes's written statement was made involuntarily—that is why the jury charge instructed jurors not to consider the written statement unless it found beyond a reasonable doubt that the statement was made freely and voluntarily, without compulsion or persuasion. *See* TEX. CODE CRIM. PROC. ANN. art. 38.21. The only question for us is whether Cervantes's written statement was involuntary and inadmissible *as a matter of*

18

*law* such that the trial court's denial of Cervantes's motion to suppress was erroneous. *Harris* is distinguishable because, unlike the accused in that pre-*Miranda* case, Cervantes is literate, was clearly warned that his statement may be used against him in court, and was fully advised of his rights to remain silent and to obtain advice of legal counsel. *See Harris*, 338 U.S. at 70. The mere fact that police suggested that they would arrest Cervantes's wife does not, by itself, render his statement involuntary under *Harris*.

Finally, *Lynumn* is distinguishable because nothing in that opinion indicates that the trial court made an explicit factual finding that no coercive promises were made. *See Lynumn*, 372 U.S. at 529–38. Here, on the other hand, as set forth above, the trial court stated in its findings of fact and conclusions of law that "no investigator promised [Cervantes] anything in exchange for his statement . . . ." Though the evidence was uncontroverted that Tanguma told Cervantes that "his children would be taken into the custody of Child Protective Services and his wife would be arrested," the trial court was free to disbelieve that evidence. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("[At a suppression hearing, the trial court] is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because [s]he has the opportunity to observe the witness's demeanor and appearance."); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (same)[9]; *see also Kelly v. State*, 163

---

[9] *Ross*, which was decided after *Harris* and *Lynumn*, superseded *Farr v. State* and its progeny, which held that whenever the testimony of the accused as to alleged coercive acts is undisputed, then as a matter of law the confession is inadmissible. 519 S.W.2d 876, 880 (Tex. Crim. App. 1975); *see Barton v. State*, 605 S.W.2d 605, 607 (Tex. Crim. App. [Panel Op.] 1980) ("Uncontroverted testimony of an accused that a confession was procured through coercive acts renders such confession inadmissible as a matter of law."); *Sinegal v. State*, 582 S.W.2d 135, 137 (Tex. Crim. App. [Panel Op.] 1979) (citing *Farr*); *Smith v. State*, 547 S.W.2d 6, 8 (Tex. Crim. App. 1977) ("[Appellant's] contention must be sustained because his allegations of coercion were not rebutted by the State."); *Sherman*, 532 S.W.2d at 636 ("[T]he trial court abused its discretion in overruling appellant's motion to suppress because appellant's allegations of coercion were not contradicted.").

S.W.3d 722, 727 (Tex. Crim. App. 2005) ("[T]he factfinder is empowered, on the basis of credibility and demeanor evaluations, to completely disregard a witness's testimony, even if that testimony is uncontroverted."). The trial court was also entitled to disbelieve Cervantes's allegation that he "told [the investigator] what he wanted to hear" only because of his fear that he would not see his son or wife again. *See Valtierra*, 310 S.W.3d at 447; *Ross*, 32 S.W.3d at 855. Because the finding that "no investigator promised [Cervantes] anything in exchange for his statement" was reasonably supported by the record, we defer to it. *See Dixon*, 206 S.W.3d at 590.

By his sixth issue, Cervantes contends that his waiver of rights "cannot be valid because Tanguma admitted that he did not understand *Miranda* rights, and cannot be found to have adequately explained them." Cervantes refers to the following testimony given by Tanguma on cross-examination at trial:

Q. [Defense counsel] What is *Miranda*?

A. [Tanguma]      The *Miranda*?

Q.            Uh-huh.

A.            It's a—the law that they have, it's a name that they came out from a guy named—I don't recall at this time. It was made because some law was broken and they made a *Miranda* warnings, they named them after that person.

Q.            Okay. But what does *Miranda* stand for?

A.            I don't recall at this time, sir.

. . . .

Q.            So if you don't recall what *Miranda* stands for, how can you have expected Mr. Cervantes to have understood what it stood for?

20

A.            I explained to him the rights.

Q.            But you just told us you don't know what they are. So tell us exactly what you explained to him?

A.            The rights of an individual.

Q.            Thank you.

A.            When they're going to get interviewed.

Q.            But you've told us you don't know what *Miranda* is?

A.            No, I don't, sir.

Cervantes argues that he "cannot knowingly, intelligently, and voluntarily waive his *Miranda* rights pursuant to Tanguma's explanation of those rights, if Tanguma himself does not understand them."

We disagree. Cervantes does not cite any authority establishing that an interrogating officer must "understand" *Miranda* rights in order to effectively warn an accused of those rights. *See Purtell v. State*, 761 S.W.2d 360, 375 (Tex. Crim. App. 1988) ("Absent some specific requirement that an interrogator explain all of the possible legal uses of a piece of evidence to a defendant, we hold that defense counsel is the party best qualified and best situated to carry out this function."). The statute does not require that an interrogator understand or even explain the rights to an accused; instead, it only requires that an accused be given five specific warnings. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a). Tanguma testified that he orally advised Cervantes of each of the five rights enumerated in article 38.22, section 2(a) prior to the interview. Therefore, the trial court's finding that Cervantes was advised of his *Miranda* rights in a manner that comported with the law was supported by the record, and we may not disturb it. *See Jackson v. State*, 33 S.W.3d 828, 838 (Tex. Crim. App. 2000) ("We will not disturb factual

21

determinations made by the trial court at a hearing on a motion to suppress evidence if the record supports its findings.").

Considering the totality of the circumstances, *see Smith*, 779 S.W.2d at 427, we conclude that that the trial court did not err in denying Cervantes's motion to suppress. Cervantes's second, third, and sixth issues are overruled.

### 2.     Compliance with Article 38.22, Section 2

By his fifth issue, Cervantes argues that his statement was inadmissible because his waiver of rights did not comply with article 38.22, section 2 of the code of criminal procedure.  Cervantes does not dispute that the waiver form advised him of his rights as set forth in article 38.22, section 2(a).  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a). His argument is that the waiver form is invalid because it does not "state that the signing party 'knowingly, intelligently, and voluntarily' waived" those rights.  *See id.* art. 38.22, § 2(b).[10]

We disagree.   The written statement at issue, entered into evidence at trial as State's Exhibit 95, consists of five pages with the following language printed at the top of each page:

> I, Fernando Cervantes, after being duly warned by Investigator Fernando Tanguma the person to whom this statement is made, that

---

[10] Cervantes's argument as to this issue appears to be based not on the waiver contained within the written statement made the subject of the motion to suppress, but rather on the separate waiver of rights form that he executed prior to his interview.  That form, entered into evidence at trial as State's Exhibit 94, lists the article 38.22, section 2(a) rights but does not explicitly state that Cervantes "knowingly, intelligently, and voluntarily" waived them; instead, it merely asks "Do you understand your Miranda warnings?" and "If so, would you like to waive your rights?"  (Cervantes's initials appear next to "YES" with respect to both questions, as well as next to each of the enumerated rights.)  We do not address whether this separate waiver form complied with article 38.22, section 2(b), because we find that the waiver contained in the written statement itself complied with that statute.  *See* TEX. R. APP. P. 47.1.  For the same reason, we do not address Cervantes's fourth issue, which also appears to challenge the validity of the separate, superfluous waiver form.  *See id.*

1.	I have the right to remain silent and not make any statement at all and that any statement I make may be used as evidence against me at my trial;

2.	Any statement I make may be used as evidence against me in court;

3	I have the right to have a lawyer present to advise me prior to and during any questioning;

4.	If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;

5.	I have the right to terminate the interview at any time.

And prior to and during the making of this statement, I knowingly, intelligently and voluntarily waive those rights set forth in this document and have knowingly, intelligently and voluntarily waived those rights. I do hereby make the following free and voluntary statement.

Cervantes's initials appear next to each enumerated right on each of the five pages, and his signature appears at the bottom of each page underneath the following language: "I give this statement of my own free will, not promised anything in return, and not coerced into giving this statement."

The written statement, which included the waiver set forth above on each page, clearly shows "on its face" that Cervantes was advised of his rights as set forth in article 38.22, section 2(a) and that, "prior to and during the making of the statement," he "knowingly, intelligently, and voluntarily" waived those rights.[11]  *See id.* art. 38.22, § 2. Cervantes's fifth issue is overruled.

---

[11] In *Garcia v. State*, the Texas Court of Criminal Appeals found that the appellant's statement was sufficient to satisfy article 38.22, but it emphasized that the waiver was "by no means a model of clarity on this point." 919 S.W.2d 370, 387 (Tex. Crim. App. 1994). Instead,

> [t]he clearly preferable practice is for a written statement, to meet unambiguously the requirements of Section 2(b), to contain the following language, near or adjacent to the signature of the individual giving the statement: "I knowingly, voluntarily and intelligently waived the rights described above before and during the making of this statement."

*Id.* In contrast, the waiver at issue here is indeed a "model of clarity," as it precisely tracks the statute as recommended by the *Garcia* Court. *See id.*; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West,

## IV.  Conclusion

Having overruled Cervantes's issues, we affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
4th day of December, 2014.

---

Westlaw through 2013 3d C.S.).